**PLANNED PARENTHOOD OF SOUTH-EASTERN PENNSYLVANIA, et al.**

v.

**Robert P. CASEY, et al.**

Civ. A. No. 88–3228.

United States District Court,
E.D. Pennsylvania.

May 23, 1988.
As Amended June 13, 1988.

**1092**

Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiffs.

Gregory R. Neuhauser, Sr. Deputy Atty. Gen., Com. of Pennsylvania, Office of Atty. Gen., Harrisburg, Pa., for defendants.

### FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND PRELIMINARY INJUNCTION

HUYETT, District Judge.

## INTRODUCTION

In this action for declaratory and injunctive relief, plaintiffs challenge the 1988 amendments to the Pennsylvania Abortion Control Act of 1982, Act of March 25, 1988, No. 31 §§ 3–10, 1988 Pa.Legis.Serv. 173 (Purdon) ("Act 31"), amending 18 Pa.C.S.A. §§ 3201–20 (the "Act").[1] Plaintiffs assert that Act 31 violates the United States Constitution and 42 U.S.C. § 1983. I have subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), and the Fourteenth Amendment to the United States Constitution.

Act 31 was scheduled to take effect on April 24, 1988.[2] On April 21, 1988, following a hearing, I granted plaintiffs' application for a temporary restraining order and enjoined defendants from enforcing the provisions of section 3206 of the Act and from publicly disclosing or otherwise making available for public inspection and copying any report filed pursuant to sections 3207(b) or 3214(f) of the Act until further order of the court.

An evidentiary hearing and oral argument on plaintiffs' motion for a preliminary injunction was held on May 9, 1988. Following that hearing, and by agreement of the parties, I ordered that the temporary restraining order issued on April 21, 1988 would remain in effect until such time as I ruled on the motion for a preliminary injunction. I further suspended the requirement that certain reports be filed with the Commonwealth on May 15, 1988.

The parties have entered into a comprehensive stipulation of facts for the purposes of the motion for a preliminary injunction only. Based on that stipulation and the evidence of record, and in the context of this motion for a preliminary injunction, I make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Thomas E. Allen is a physician licensed to practice medicine in Pennsylvania and is an Associate Clinical Professor in the Department of Obstetrics and Gynecology at the University of Pittsburgh. He graduated from the University of Pittsburgh School of Medicine. He is an active staff member of Magee Women's Hospital, is on the Consulting Staff of Presbyterian University Hospital, and is Medical Director of Women's Health Services Incorporated. He has been a Diplomate of the American Board of Obstetrics and Gynecology since 1954, has been a Fellow of the American College of Obstetrics and Gynecology since 1955, and a Fellow of the Pittsburgh Obstetrical and Gynecological Society since 1974. From 1972 to the present, Dr. Allen has been active in planning, establishing and administering Women's Health Services, Pittsburgh's first free standing abortion clinic. From 1970 to 1979, he was active in establishing and contributing services to the Pittsburgh Free Clinic. Dr. Allen has a private obstetrical and gynecological practice with four other specialists. [Stipulation of Uncontested Facts para. 1]

---

1. Hereinafter, all citations to 18 Pa.C.S. §§ 3201–20 refer to the amended act, unless otherwise specified.

2. The prior history of the Act is set forth in *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) and *American College of Obstetricians and Gynecologists v. Thornburgh,* 656 F.Supp. 879 (E.D.Pa.1987).

2. Plaintiff Planned Parenthood of Southeastern Pennsylvania (PPSP) is a non-profit corporation providing comprehensive family planning, medical and counseling service (including birth control education), pregnancy testing and counseling, gynecological care, first trimester abortions, and vasectomies at medical clinics in Philadelphia, Montgomery and Delaware counties. The Center City Philadelphia clinic offers these services Monday through Friday. Abortions are performed on Wednesdays, Thursdays, Fridays and Saturdays at PPSP's Center City Philadelphia Clinic. [Stipulation of Uncontested Facts para. 2]

3. Plaintiff Reproductive Health and Counseling Center (RHCC) is a for-profit corporation in Chester, Pennsylvania which operates a clinic providing first and second trimester abortions. [Stipulation of Uncontested Facts para. 12]

4. Plaintiff Women's Health Services, Inc. (WHS) is a non-profit health center in Pittsburgh, Pennsylvania providing fertility control education, pregnancy counseling, contraceptive and gynecological care, public education, and first and early second trimester abortions. [Stipulation of Uncontested Facts para. 25]

5. Plaintiff Women's Suburban Clinic (WSC) is a non-profit corporation in Paoli, Pennsylvania which operates a health care facility providing abortions, ongoing gynecological services, mini-laparotimies, pregnancy testing, community education, and counseling. [Stipulation of Uncontested Facts para. 39]

6. Plaintiff Allentown Women's Center (AWC) is a for-profit corporation in Allentown, Pennsylvania which operates a clinic providing pregnancy testing and counseling, contraceptive and gynecological care and first trimester abortions. [Stipulation of Uncontested Facts para. 53]

7. Defendant Robert P. Casey is the Governor of the Commonwealth of Pennsylvania. [Stipulation of Uncontested Facts para. 83]

8. Defendant N. Mark Richards, M.D., is the Secretary of Health for the Commonwealth of Pennsylvania. [Stipulation of Uncontested Facts para. 84]

9. Defendant LeRoy S. Zimmerman is the Attorney General of the Commonwealth of Pennsylvania. [Stipulation of Uncontested Facts para. 85]

10. Defendant Michael D. Marino is the District Attorney for Montgomery County, Pennsylvania. [Stipulation of Uncontested Facts para. 86]

11. Sue Roselle testified at the hearing on May 9, 1988. I found her testimony to be credible in all respects. Ms. Roselle is the Executive Director of Women's Health Services, Inc. As Executive Director, she is responsible for the ongoing operation of the clinic and for staff selection, and reports to the Board of Directors of WHS. She holds a Master of Social Work degree from the University of Illinois at Urbana, and an M.S.B.A. in management from Robert Morris College. She is Treasurer of the Pennsylvania Chapter of the National Association of Social Workers, a member of the Academy of Certified Social Workers, President of Pennsylvanians for a Right to a Private Life, and serves on the Health Services Committee of the American Red Cross, Pittsburgh–Allegheny Chapter. She has over ten years' experience in health care administration, including emergency medical services and home health care. She is a former director for emergency medical service systems for the 12 counties of southwestern Pennsylvania. [Testimony of S. Roselle; Verification of S. Roselle]

12. Sylvia Stengle testified at the hearing on May 9, 1988. I found her testimony to be credible in all respects. Ms. Stengle is the founder and Director of the Allentown Women's Center. She is responsible for the ongoing operation of the clinic and hiring. She holds a Bachelor of Arts degree from the University of Wisconsin, and has taken graduate courses in sociology and psychology. Prior to founding AWC in 1978, she was the Education Director for Planned Parenthood of Northampton County, Pennsylvania. She has been personally involved in counseling since 1973, and now supervises the AWC counseling staff. She serves on the Board of Directors of the

National Abortion Rights Action League. [Testimony of S. Stengle; Verification of S. Stengle]

13. Cathy Dratman, M.D., testified at the hearing on May 9, 1988. I found her testimony to be credible in all respects. Dr. Dratman is licensed to practice medicine in Pennsylvania and New Jersey. She is a graduate of Hahnemann Medical College and served an internship and residency at Pennsylvania Hospital in Philadelphia. She is board certified by the American Board of Obstetrics and Gynecology, and is a Fellow of the American College of Obstetrics and Gynecology. She has been Medical Director of Planned Parenthood of Southeastern Pennsylvania since 1986, and has had a private obstetrical and gynecological practice in New Jersey. She does not presently perform abortions, but in the past has performed and referred patients for first trimester and second trimester abortions up to 20 weeks gestation. As Medical Director of PPSP, she maintains close contact with, and generally oversees, all abortion procedures performed at the clinic. [Testimony of Dr. Dratman; Verification of Dr. Dratman]

14. Patricia Potrzebowski, Ph.D., has submitted a declaration and supplementary declaration in this matter. She is the Director of the Division of Health Statistics and Research, State Health Data Center, Department of Health (hereinafter Health Statistics Division). [Stipulation of Uncontested Facts para. 235] She has been the Division Director since late 1976 or early 1977. [Stipulation of Uncontested Facts para. 236] She has a Bachelor of Science in Biology from Schimer College, Mount Carroll, Illinois. In 1974, she obtained a doctorate degree in human genetics from the Graduate School of Public Health from the University of Pittsburgh. [Stipulation of Uncontested Facts para. 237]

15. Plaintiff Planned Parenthood of Southeastern Pennsylvania performs approximately 2,800 first trimester abortions a year. The abortion procedure presently costs full-payment patients $225 if the woman is 12 weeks or less from her last menstrual period. All fees cover only the direct costs of the procedure, including personal counseling, medical testing and examination, the abortion procedure, medical supervision during the post-surgical recovery, and a post-abortion examination. [Stipulation of Uncontested Facts para. 3]

16. PPSP charges $180 for abortions for women who are on medical assistance but whose abortions are not reimbursable by the state. [Stipulation of Uncontested Facts para. 4]

17. PPSP accepts state medical assistance reimbursement in lieu of direct payment for abortions for victims of rape and incest, and for women with life-threatening conditions. [Stipulation of Uncontested Facts para. 5]

18. In 1987, PPSP performed 359 abortions for women under the age of 18. [Stipulation of Uncontested Facts para. 6]

19. When a woman believing she is pregnant presents herself at a PPSP clinic, she is given a pregnancy test and examined by a nurse practitioner or physician. Women who believe they have just recently become pregnant are offered early detection by means of a blood test or special urine test. Once it is determined that she is pregnant, the woman is encouraged to participate in an individual options counseling session with a PPSP counselor. [Stipulation of Uncontested Facts para. 7]

20. Options counselors are volunteers or staff counselors who have completed a special training program under the supervision of PPSP counselors and other senior staff. This training program consists of 43 hours of group sessions that focus on factual information regarding adoption, abortion, contraception and referral resources. The course also gives participants the opportunity to evaluate, explore and share their attitudes and feelings. The course is certified by Temple University. Participants receive four CEU credits for completion of the training. [Stipulation of Uncontested Facts para. 8]

21. Abortion counselors are members of PPSP's counseling staff or college student interns working under the supervision of a staff counselor. These counselors have college backgrounds and experience in a

health or social services related field. All have had on-site training in pregnancy counseling and abortion care and are required to participate in ongoing in-service training. [Stipulation of Uncontested Facts para. 9]

22. Each PPSP client participates in an individual abortion counseling session on the day her procedure is scheduled. In this session, the counselor and the woman discuss the woman's medical history, personal situation and feelings about abortion. The counselor explains the abortion procedure and its risks. Post-abortion care and contraceptive plans are also explored. In the course of this session the information necessary for informed consent is presented to the client. These sessions routinely last 30–40 minutes. If the client has been accompanied to the clinic by a person she wishes to involve in the counseling, that person will be included in part of this session. In some cases, the abortion counselor will serve as the support person and accompany the woman through the procedure. [Stipulation of Uncontested Facts para. 10]

23. PPSP counseling sessions for minors are more extensive, to assure that minors are fully informed of all options, are relatively clear-minded, and are making a free and informed choice. They are given detailed information on the procedure and its risks. They are also counseled on future contraceptive care. When a minor does choose to involve a parent or other supportive adult such as an aunt, guardian or older sibling, the counselor will first meet privately with the minor. Then, at the counselor's discretion and with the minor's consent, the parent or adult will be brought in for joint counseling. [Stipulation of Uncontested Facts para. 11]

24. PPSP advertises that it provides abortion services in the telephone directories serving the greater Philadelphia and Delaware County areas. [Stipulation of Uncontested Facts para. 81]

25. Plaintiff Reproductive Health and Counseling Center operates a clinic that performs approximately 2,900 first and early second trimester abortions annually.

[*See* Stipulation of Uncontested Facts para. 12]

26. RHCC employs a staff of approximately six physicians, one nurse practitioner, and two full-time and three part-time counselors. Abortions are performed on Wednesday and Friday afternoons and on Saturday mornings. Additional counseling services are available by appointment. [Stipulation of Uncontested Facts para. 13]

27. First trimester abortions (up to 12 weeks from the last menstrual period) with local anesthesia costs RHCC clients $210. For abortions from 12 to 16 weeks from the last menstrual period, the cost is $365, plus an additional $70 for a required ultrasound. [Stipulation of Uncontested Facts para. 14]

28. If RHCC's clients are eligible for medical assistance reimbursement, RHCC seeks reimbursement from the Commonwealth. [Stipulation of Uncontested Facts para. 15]

29. Where a client receives medical assistance from the state but is not eligible for medical assistance for an abortion, RHCC provides a $50 cost reduction for first trimester abortions with local anesthesia. [Stipulation of Uncontested Facts para. 16]

30. While RHCC's clients come primarily from Delaware, Philadelphia, Chester and Bucks counties, approximately 3–4% of its clients come from areas in excess of three hours traveling time. [Stipulation of Uncontested Facts para. 17]

31. In 1987, RHCC performed abortions on 349 minors. Approximately 60% of these minors were accompanied by a parent. All minors who choose not to be accompanied by a parent must be accompanied by a responsible adult who will stay in the building as long as the minor is there and will accompany the minor home. [Stipulation of Uncontested Facts para. 18]

32. A woman's first contact with RHCC is usually by telephone. Women who call RHCC may or may not have had a pregnancy test prior to calling. Before any appointment is made, she must have had a positive pregnancy test. Telephone coun-

selors refer the woman to RHCC or to the agency closest to her home or place of work for the test. [Stipulation of Uncontested Facts para. 19]

33. If a woman has had a positive pregnancy test and wants to terminate the pregnancy, RHCC will schedule an abortion appointment, usually within one week's time. If the woman indicates uncertainty about her decision, the telephone counselor will recommend that she make an appointment to talk further with an options counselor about her decision. [Stipulation of Uncontested Facts para. 20]

34. RHCC strongly urges options counseling for all minors who have not involved their parents in the decision. [Stipulation of Uncontested Facts para. 21]

35. In an options counseling session, an RHCC counselor talks with the woman about her feelings about her pregnancy. The purpose of the session is to let the woman know about each of the three options available to her: carrying to term and keeping the child, carrying to term and giving the child up for adoption, and pregnancy termination. The woman is urged to talk about these options with supporting family members and friends. The role of the counselor in these sessions is to support the decision of the woman and to provide information that would be necessary as she acts on her decision. [Stipulation of Uncontested Facts para. 22]

36. Pre-abortion counseling at RHCC, in which each woman must participate on the day of her abortion and which is different from options counseling, involves a discussion of the woman's decision, a review of her medical history and a description of the risks and complications of the abortion procedure. The informed consent part of the session is conducted in groups of four women. The counselor describes the medical procedure, reviews the risks and complications, and answers questions or addresses concerns. RHCC also provides counseling to the person or persons who accompany the woman for an abortion. [Stipulation of Uncontested Facts para. 23]

37. Pre-abortion and options counselors are trained and supervised by RHCC's head counselor, who has nine years' counseling experience. [Stipulation of Uncontested Facts para. 24]

38. RHCC advertises that it provides abortion services in the telephone directory serving the Delaware County—Main Line areas. [Stipulation of Uncontested Facts para. 82]

39. Plaintiff Women's Health Services, Inc. has a staff of approximately 85 people (including 13 physicians, 14 nurses and 30 counselors) and offers ongoing programs which are inclusive of approximately 3,000 client contacts a month. [Stipulation of Uncontested Facts para. 25]

40. Free pregnancy testing and counseling are available at WHS daily, Monday through Saturday. Abortions are performed Tuesdays, Fridays and Saturdays. Gynecology clinics are held on Wednesdays and Thursdays and any other day a patient's condition dictates. Once their pregnancies are diagnosed, clients usually schedule their abortions by telephone. [Stipulation of Uncontested Facts para. 26]

41. WHS provides approximately 11,800 free pregnancy tests and 7,600 first and early second trimester abortions each year. The cost of an abortion procedure at WHS is as follows: $275 if twelve weeks or less from the last menstrual period; $375 if thirteen to fourteen weeks from the last menstrual period; and $500 if fifteen to sixteen weeks from the last menstrual period. The fee includes the abortion procedure, laboratory testing, personal counseling (including contraceptive care), pathological examination, and medical supervision during the post-surgical recovery period. [Stipulation of Uncontested Facts para. 27]

42. WHS accepts state medical assistance reimbursement in lieu of direct payment for abortions for victims of rape and incest, and for women with life-threatening conditions. [Stipulation of Uncontested Facts para. 28]

43. Where a client receives medical assistance from the state, but is not eligible for medical assistance for an abortion, WHS nevertheless will discount the cost of the abortion. Last year, WHS accommo-

dated 1,470 clients who were unable to pay the full amount. WHS has never turned away any client seeking an abortion merely because of inability to pay. [Stipulation of Uncontested Facts para. 29]

44. WHS's clients come primarily from Allegheny County. In 1987, however, 761 of their abortion clients came from areas in excess of two hours traveling time (100 miles) from the clinic. [Stipulation of Uncontested Facts para. 30]

45. In 1987, 907 of WHS's abortion clients were under the age of 18. WHS presently encourages minors to bring a parent or other adult with them. Because WHS believes that parental involvement should be encouraged, clinic counselors are instructed to offer to speak with a minor's parents. When a minor refuses to inform her parents of her pregnancy under any circumstances, her wishes are presently respected. [Stipulation of Uncontested Facts para. 31]

46. When women present themselves at the WHS clinic, if indicated, they are examined by a nurse practitioner or physician's assistant. All women receive a pregnancy test and blood tests. In addition, every woman is required to have an individual interview with a counselor on the day her abortion is to be performed. These interviews routinely last twenty minutes to one hour. During this interview, a woman is counseled with respect to her options and her decision to have an abortion. In that connection, the counselor seeks to ensure that the woman is not unduly ambivalent about her decision and that she is not being coerced. In addition, the counselor discusses future contraceptive use with the patient. If the client appears ambivalent about her decision, the counselor will refer her to one of the WHS staff therapists and the abortion will be rescheduled to give the patient more time to consider her options. The clinic will refuse to perform the abortion if convinced of a patient's continued ambivalence. This is rare, however, because the great majority of WHS's patients have absolutely decided to have an abortion before seeking medical care. [Stipulation of Uncontested Facts para. 32]

47. When a parent accompanies a minor seeking an abortion, WHS first counsels the minor with respect to her options and her decision to have an abortion, and also provides her with information on future contraceptive use. The parent is then asked to join the minor, at which time the abortion procedure and possible complications are described. The counselor also answers any questions they might have. An informed consent form is then read out loud to the parent and minor while they follow along with their own copies. Each then signs the form in the medical record. [Stipulation of Uncontested Facts para. 33]

48. Options counseling is provided on the day of the procedure by WHS paraprofessional counselors, who are selected on the basis of personal qualifications and maturity. [Stipulation of Uncontested Facts para. 34]

49. Extensive and intensive problem pregnancy counseling is available to all WHS clients at no charge, either before or after a decision with respect to an abortion has been made, regardless of what that decision may be. [Stipulation of Uncontested Facts para. 35]

50. Personal counseling is also available after the abortion procedure; clients are encouraged to take advantage of the service. [Stipulation of Uncontested Facts para. 35]

51. Personal counselors at WHS are professional therapists who have at least five years of clinically supervised experience at the master's degree level or above. At present, both of WHS's personal counselors hold Ph.D. degrees. [Stipulation of Uncontested Facts para. 36]

52. Both paraprofessional and professional counselors at WHS are required to begin their employment with a week of classroom preparation, consisting of approximately 35 hours of medical and counseling orientation to the abortion clinic. This instruction is provided by the Associate Medical Director, Director of Counseling and Training, and Director of Clinic Services. [Stipulation of Uncontested Facts para. 37]

53. All medical information is developed and presented under the supervision of a physician, the WHS Associate Medical Director. The counseling protocols are developed and presented under the supervision of the Director of Counseling and Training, who holds a Ph.D. from the University of Pittsburgh. WHS also has an ongoing training module comprised of bimonthly in-services and quarterly individual supervision. [Stipulation of Uncontested Facts para. 38]

54. WHS advertises that it provides abortion services in the telephone directories serving the greater Pittsburgh and Aliquippa areas. [Stipulation of Uncontested Facts para. 80]

55. Plaintiff Women's Suburban Clinic performs approximately 3,350 first trimester abortions a year. Abortions are performed Tuesdays, Wednesdays and Thursdays. [Stipulation of Uncontested Facts para. 40]

56. Of the approximately 3,350 abortions WSC performed in 1987, 410 (12.25%) were performed on minors. [Stipulation of Uncontested Facts para. 41]

57. The fee for an abortion at WSC is $225. At present, WSC accepts state medical assistance reimbursement in lieu of direct payment for abortion for victims of rape and incest, and for women with life-threatening conditions. [Stipulation of Uncontested Facts para. 42]

58. Appointments for counseling and abortions are made through WSC telephone counselors. A positive pregnancy test is required before an abortion is scheduled. [Stipulation of Uncontested Facts para. 43]

59. Depending upon patient interest and availability, appointments are made at WSC in one of the following ways:

a. If a woman requests counseling and the abortion on the same day, the first available appointment is given. There is often a one to two week wait in obtaining such an abortion. Approximately 70% of the abortion appointments are scheduled this way.

b. If a woman wants to see a counselor prior to the day of her abortion, a pre-abortion counseling session is made. Approximately 30% of the abortion appointments are scheduled this way.

[Stipulation of Uncontested Facts para. 44]

60. All minors who have not informed a parent about their decision to have an abortion are asked to come to WSC for precounseling before the abortion appointment. This is done to give adolescents the opportunity to explore with a professional counselor their reasons for not involving their parents, and affords them the time and opportunity to reevaluate that decision prior to the abortion. [Stipulation of Uncontested Facts para. 45]

61. A woman who calls WSC and expresses concern and confusion over an unwanted pregnancy is offered an opportunity to see a counselor to discuss her options. Resource information is available for options including keeping the child, foster care and adoption. Information concerning maternity homes is also available for those women who wish to carry their pregnancies to term. [Stipulation of Uncontested Facts para. 46]

62. All counseling at WSC is provided on an individual basis by a trained counselor. All but one member of WSC's counseling staff have master's degrees; the other has a bachelor's degree with several years' experience in counseling and family planning. All have backgrounds in various fields of human services. [Stipulation of Uncontested Facts para. 47]

63. Counseling sessions at WSC average between thirty minutes to an hour. [Stipulation of Uncontested Facts para. 48]

64. WSC believes that part-time employment is necessary in order to counsel effectively without becoming overstressed by the emotional demands of the job. Therefore, no counselor is scheduled to see clients more than 20 hours a week. [Stipulation of Uncontested Facts para. 49]

65. WSC suggests that partners and/or parents be seen by a counselor during or after the counseling session. However, all clients are first seen alone by a WSC coun-

selor. [*See* Stipulation of Uncontested Facts para. 50]

66. Counseling at WSC is provided in an objective, nonjudgmental manner. The client's decision is reviewed and explored. The counselor also reviews the client's medical history, describes the abortion procedure, reviews birth control methods and goes over the informed consent form. Disclosure of medical risks and benefits tailored to the needs of individual clients is made as well. Also, post-abortion information, including what to do in the event of an emergency, is reviewed. [Stipulation of Uncontested Facts para. 51]

67. For women who express ambivalence over their abortion decision, the WSC counselor will explore further. If the counselor feels that the woman is not sure of her decision, it is suggested that she take some time to reevaluate her choice. Additional counseling is available to help the woman to come to a decision with which she feels comfortable. [Stipulation of Uncontested Facts para. 52]

68. Plaintiff Allentown Women's Center provides approximately 5,300 pregnancy tests and 4,000 first trimester abortions each year. [Stipulation of Uncontested Facts para. 54]

69. Abortions are performed at AWC three to five days a week, depending on patient need. [Stipulation of Uncontested Facts para. 55]

70. The abortion procedure at AWC costs $250, with additional charges for services such as RhoGam shots for women more than 12 weeks pregnant and general anesthesia. The fee includes personal counseling both before and after the abortion, the abortion procedure, laboratory testing, and medical supervision during the post-surgical period. [Stipulation of Uncontested Facts para. 56]

71. For patients who receive medical assistance from the Commonwealth, AWC's fee for an abortion is $195. [Stipulation of Uncontested Facts para. 57]

72. AWC has received state medical assistance reimbursement in lieu of direct payment for abortions for victims of rape and incest, and for women with life-threatening conditions. [Stipulation of Uncontested Facts para. 58]

73. AWC's patients come primarily from an 18–county area in northeastern Pennsylvania encompassing the counties of Lehigh, Northampton, Carbon, Schuylkill, Luzerne, Lackawanna, Lebanon, Berks, Bucks, Pike, Chester, Lancaster, Susquehanna, Wayne, Monroe, Montgomery, Columbia and Wyoming. Many of these counties have no local services available to women seeking abortions, AWC being the closest facility to which the women can come. [Stipulation of Uncontested Facts para. 59]

74. In 1987, 946 (22%) of AWC's abortion patients were 18 or under. Of these, 3 were age 13; 32 were age 14; 64 were age 15; 178 were age 16; 286 were age 17; and 383 were age 18. An additional 366 were 19 year-olds. Most of those minors between ages 13 and 15 involved a parent in their decision to have an abortion. Approximately one-half of the 16 year-old minors involved a parent; while less than half of the 17 year-olds involved a parent. [Stipulation of Uncontested Facts para. 60]

75. AWC encourages its minor patients to involve their parents in the abortion decision and to bring a parent or other supporting adult with them at the time of counseling and the procedure. Clinic counselors are routinely available to speak with a minor's parents. When a minor refuses to inform her parents under any circumstances, AWC respects those wishes. [Stipulation of Uncontested Facts para. 61]

76. Approximately 54% of AWC's minor patients have parental consent for abortions. [Testimony of S. Stengle]

77. In all cases, AWC requires that some adult is available to care for a minor patient. [Testimony of S. Stengle]

78. In most cases, appointments for counseling and abortions at AWC are made through telephone counselors. A positive pregnancy test is required before an abortion will be scheduled. When a woman calls requesting an abortion, the telephone counselor collects personal data, menstrual

history and medical history. If the caller is a minor, the telephone interview is more extended to assure that the minor fully understands what she must do and what the procedure will involve. [Stipulation of Uncontested Facts para. 62]

79. When a telephone counselor makes an appointment, preabortion instructions are given to the woman. These instructions include what the woman must do and what she must bring with her on the day of the appointment. [Stipulation of Uncontested Facts para. 63]

80. Any woman who calls AWC and expresses concern and confusion over an unwanted pregnancy is offered an opportunity to see a counselor to discuss her options. Resource information is available for options, including keeping the child, foster care, and adoption. Information concerning prenatal care, welfare and support services is also available for those women who wish to carry their pregnancies to term. [Stipulation of Uncontested Facts para. 64]

81. When they present themselves at AWC's clinic, all women are examined by a nurse practitioner or physician's assistant and, where necessary, are given a pregnancy test and blood workup. In addition, all women are required to have an individual interview with a counselor on the day their abortion is scheduled. These interviews routinely last from 20 minutes to an hour. In this interview, the abortion procedure and other alternatives are explained to the woman. [Stipulation of Uncontested Facts para. 65]

82. If the patient appears ambivalent about her decision to have an abortion, the AWC counselor will review options and suggest that the patient take more time to consider her decision before terminating the pregnancy. On occasion, the clinic has refused to permit an abortion if, after consultation, the counselor and the clinic supervisor are convinced of the woman's extreme ambivalence, coercion, or that she is otherwise overly distraught. They will sometimes refer these women to outside counselors. Such instances are infrequent, however, because the great majority of AWC's patients have absolutely decided to have an abortion before making an appointment at the AWC clinic. [Stipulation of Uncontested Facts para. 66]

83. When a parent does accompany a minor to the AWC clinic, a counselor will first meet privately with the minor. After assuring that the minor has reached her decision to have an abortion freely and without coercion, the counselor will give the minor the option to continue the counseling session jointly with her parent, or to be counseled separately. In either case, the counselor will describe the procedure and possible complications, as well as answer any questions they may have. The minor is then asked to sign an informed consent form. [Stipulation of Uncontested Facts para. 67]

84. When a minor chooses not to have a parent involved, AWC counselors explore and encourage the involvement of a supporting adult. Counseling of minors who have not informed their parents is more extensive and includes a discussion of why the minor has chosen not to involve her parents. [Stipulation of Uncontested Facts para. 68]

85. The options counseling provided on the day of the procedure at AWC is conducted by paraprofessional staff counselors, who are selected on the basis of personal qualifications. Most of the counseling staff have bachelor's degrees. Two are presently working on master's degrees. All have backgrounds in various fields of human services. [Stipulation of Uncontested Facts para. 69]

86. All of AWC's counselors are required to begin their employment with at least one week of orientation. Instruction is provided by the Director, the nurse practitioner, the Patient Services Coordinator and other counseling staff. During the first months of work, the new staff has frequent meetings either on an individual basis or as a group with administrative staff to reinforce correct integration of medical information and continued development of interviewing skills. [Stipulation of Uncontested Facts para. 70]

87. All medical information is developed and presented under the supervision of a

physician who is AWC's medical director. The counseling protocols are developed and presented under the supervision of the Patient Services Coordinator. [Stipulation of Uncontested Facts para. 71]

88. AWC advertises that it provides abortion services in the telephone directories of several communities including but not limited to Allentown, Pottsville, Carbondale, and Hazelton. [Stipulation of Uncontested Facts para. 79]

89. At all plaintiff clinics, a counselor talks with the woman about her feelings about her pregnancy. [Stipulation of Uncontested Facts para. 75]

90. If at any time during the pre-abortion counseling session the woman expresses ambivalence or dissatisfaction with her decision to terminate her pregnancy, the counselor may recommend additional counseling to explore her options. [Stipulation of Uncontested Facts para. 76]

91. All plaintiff clinics recommend that a woman who is uncertain about her decision to obtain an abortion make an appointment to talk further with a counselor about her decision. [*See* Stipulation of Uncontested Facts para. 72] If the counselor feels that the woman is not sure of her decision, the counselor suggests that she take some time to reevaluate her choice. [Stipulation of Uncontested Facts para. 77]

92. Additional counseling by the medical providers is available to assist the woman in coming to a decision with which she feels comfortable. [Stipulation of Uncontested Facts para. 78]

93. These counseling practices inevitably cause some delay in the performance of abortions.

94. As of December 31, 1987, there were 147 facilities in the Commonwealth approved by the Department of Health to perform abortions. [Stipulation of Uncontested Facts para. 93]

95. In 1987, there were 51,630 abortions performed in Pennsylvania and reported to the Pennsylvania Department of Health. [Stipulation of Uncontested Facts para. 88] There were 51,666 abortions performed in 1986; 53,465 in 1985; 59,258 in 1984; 59,-288 in 1983; 60,772 in 1982; 62,701 in 1981; and 65,777 in 1980. [Stipulation of Uncontested Facts para. 89]

96. Of the 51,630 abortions performed in Pennsylvania in 1987, 48,923 (94.8%) were performed within the first three months of pregnancy. [Stipulation of Uncontested Facts para. 90] Conversely, 2,707 (5.2%) were performed after the first three months of pregnancy.

97. Of the 51,666 abortions performed in Pennsylvania and reported to the Pennsylvania Department of Health in 1986, 49,-278 (95.4%) were performed within the first three months of pregnancy. [Stipulation of Uncontested Facts para. 98] Conversely, 2,388 (4.6%) were performed after the first three months of pregnancy.

98. Second trimester abortions in Pennsylvania increased from 2,335 in 1986 to 2,540 in 1987. [Stipulation of Uncontested Facts para. 91]

99. I deduce that 145 abortions were performed in the third trimester in Pennsylvania in 1987.

100. Patients aged 19 and under accounted for 26.9% of abortions performed in 1987. [Stipulation of Uncontested Facts para. 92] However, I note that minors aged 18 and under accounted for only 10,-025 (19.4%) of the abortions performed in 1987. [*See* Stipulation of Uncontested Facts para. 94]

101. Patients aged 19 and under accounted for 26.3%, or 13,569 of the abortions reported in Pennsylvania in 1986. [Stipulation of Uncontested Facts para. 99] However, I note that minors aged 18 and under accounted for only 9,695 (18.8%) of the abortions performed in 1987. [*See* Stipulation of Uncontested Facts para. 101]

102. The following table represents the numbers of induced abortions performed in Pennsylvania in 1987 by age of woman, as reported to the Pennsylvania Department of Health:

| AGE (YEARS) | NUMBER |
| --- | --- |
| 10 | 0 |
| 11 | 1 |
| 12 | 16 |
| 13 | 84 |

| AGE (Years) | NUMBER |
|---|---|
| 14 | 377 |
| 15 | 955 |
| 16 | 1,896 |
| 17 | 2,768 |
| 18 | 3,928 |
| 19 | 3,883 |
| 20–24 | 17,004 |
| 25–29 | 11,005 |
| 30–34 | 6,026 |
| 35–39 | 2,915 |
| 40–44 | 721 |
| 45 or older | 40 |
| Unknown | 11 |
| TOTAL | 51,630 |

[Stipulation of Uncontested Facts para. 94]

103. The following table represents the numbers of induced abortions performed on minors in Pennsylvania in 1986 by age of woman, as reported to the Pennsylvania Department of Health:

| AGE (YEARS) | NUMBER |
|---|---|
| 11 or less | 4 |
| 12 | 15 |
| 13 | 101 |
| 14 | 399 |
| 15 | 1,041 |
| 16 | 1,935 |
| 17 | 2,674 |
| 18 | 3,526 |
| 19 or older | 41,971 |
| TOTAL | 51,666 |

[See Stipulation of Uncontested Facts para. 101]

104. The following table represents the number of induced abortions performed in Pennsylvania in 1987 by weeks since last menstrual period, as reported to the Pennsylvania Department of Health:

| WEEKS FROM LAST MENSTRUAL PERIOD | NUMBER |
|---|---|
| 10 or less | 36,279 |
| 11–12 | 9,111 |
| 13–14 | 3,533 |
| 15–17 | 2,394 |
| 18–22 | 132 |
| 23–26 | 14 |
| 27 or more | 2 |
| unknown | 165 |
| TOTAL | 51,630 |

[Stipulation of Uncontested Facts para. 95]

105 The following table represents the numbers of induced abortions performed in Pennsylvania in 1987 by primary type of procedure, as reported to the Pennsylvania Department of Health:

| PRIMARY ABORTION PROCEDURE | NUMBER |
|---|---|
| Suction Curettage | 37,666 |
| Sharp Curettage | 48 |
| Dilation and Evacuation | 13,342 |
| Intra–Uterine Saline Installation | 453 |
| Intra–Uterine Prostaglandin Instillation | 78 |
| Hysterotomy | 2 |
| Hysterectomy | 6 |
| Other | 20 |
| Unknown | 15 |
| TOTAL | 51,630 |

[Stipulation of Uncontested Facts para. 96]

106. The following table represents the number of abortions performed in Pennsylvania in 1986 by type of procedure, as reported to the Pennsylvania Department of Health:

| PRIMARY ABORTION PROCEDURE | NUMBER |
|---|---|
| Dilation, Evacuation, and Curettage | 51,031 |
| Intra-uterine Saline Installation | 450 |
| Intra-uterine Prostaglandin Installation | 152 |
| Hysterotomy | 3 |
| Hysterectomy | 3 |
| Other | 27 |
| TOTAL | 51,666 |

[See Stipulation of Uncontested Facts para. 102]

107. Of the 51,666 abortions performed in Pennsylvania and reported to the Pennsylvania Department of Health in 1986, 49,-537 were performed on Pennsylvania residents. Residents of other states and territories accounted for 2,124 abortions, and residents of other countries accounted for 5. Of the 1986 abortion patients residing in Pennsylvania, 15,471 (31.2%) resided in Philadelphia; 7,919 resided in Allegheny

County; 2,966 resided in Montgomery County; 2,794 resided in Delaware County; and 2,235 resided in Bucks County. [Stipulation of Uncontested Facts para. 100]

108. Section 3206(a), as amended by Act 31, provides:

Except in the case of a medical emergency, or except as provided in this section, if a pregnant woman is less than 18 years of age and not emancipated, or if she has been adjudged an incompetent ..., a physician shall not perform an abortion upon her unless, in the case of a woman who is less than 18 years of age, he first obtains the informed consent both of the pregnant woman and one of her parents; or, in the case of a woman who is incompetent, he first obtains the informed consent of her guardian. In deciding whether to grant such consent, a pregnant woman's parent or guardian shall consider only their child's or ward's best interest.

109. Section 3205(a), as amended by Act 31, provides:

No abortion shall be performed or induced except with the voluntary and informed consent of the woman upon whom the abortion is to be performed or induced. Except in the case of a medical emergency, consent to an abortion is voluntary and informed if and only if, prior to the consent having been given, the physician who is to perform the abortion, or the referring physician, or [another qualified person to whom the responsibility has been delegated by either physician], has orally informed the woman of the nature of the proposed procedure or treatment and of those risks and alternatives to the procedure or treatment that a reasonable patient would consider material to the decision whether or not to undergo the abortion, and the woman certifies in writing prior to the abortion that she has been provided such information.

110. The Act does not separately define "informed parental consent." The Act does not explicitly state that the parent must visit the clinic personally in order to give his or her informed consent.

111. Minors who become pregnant usually believe that they are mature enough to make the decision to consult a physician and to terminate the pregnancy. [Stipulation of Uncontested Facts para. 74]

112. Clinics in Pennsylvania that offer abortion counseling services and abortions support and encourage parental involvement in a minor's decision to have an abortion, where possible. [Stipulation of Uncontested Facts paras. 73, 105]

113. The unrebutted testimony of Sue Roselle was that, in her experience as a health care administrator, the concept of "informed consent" (as opposed to "consent") implies an in-person consultation with the patient or, in this case, parent. [Testimony of S. Roselle]

114. Under Act 31, and in the absence of further guidance from the Commonwealth or the courts concerning the procedure necessary to obtain legally valid parental consent, the plaintiff clinics will require an in-person consultation with the parent to assure the parent's consent is informed. [Testimony of S. Roselle and S. Stengle; Verifications of J. Green, S. Miller, and C. Wall. *See* Stipulation of Uncontested Fact paras. 106, 130]

115. Even if the concept of "informed consent" does not, in and of itself, require an in-person consultation, plaintiff clinics believe that an in-person visit by the parent to the clinic is necessary in order to avoid the risk of criminal or civil penalties for failure to establish proper identification of the parent. [Testimony of S. Roselle and S. Stengle; Verifications of J. Green, S. Miller and C. Wall; Stipulation of Uncontested Fact paras. 130–131]

116. Indeed, some clinics, such as plaintiff RHC, intend to require that all certifications of parenthood and the minor's age be notarized. [Stipulation of Uncontested Facts P 132] WHS probably will require all women who state their age as 24 years or less to present proof of identity, and parents to present a birth certificate to certify parenthood. [Testimony of S. Roselle]

117. Under Act 31, and in the absence of further guidance from the Commonwealth or the courts concerning the documentation necessary to establish identification of the parent or guardian, the plaintiff clinics are not willing to secure parental consent over the telephone, or by means other than an in-person visit to the clinic. [Testimony of S. Roselle and S. Stengle; Verifications of J. Green, S. Miller, and C. Wall. *See* Stipulation of Uncontested Facts paras. 107, 130–131]

118. Some parents may find it difficult to come to a clinic for the necessary counseling because of work schedules, illness, family and other commitments. [Stipulation of Uncontested Facts para. 109]

119. Some parents may be unable to come to the clinic for many days, or possibly even weeks, after their minor daughters have decided to seek an abortion. [Stipulation of Uncontested Facts para. 110]

120. Some, but not all, minors must travel long distances to reach a clinic. A parent who cannot accompany the minor on her initial trip would have to make a separate trip to the clinic to give consent if the clinics insist on an in-person meeting. Following that, the minor, whether or not accompanied by the parent, would have to make another trip to the clinic for the abortion procedure. [Stipulation of Uncontested Facts para. 113]

121. Plaintiff AWC, for example, services a large 18-county area. In 1987, of its approximately 4,000 abortion patients, 138 (3.26%) came from areas in excess of two hours travelling time (100 miles) from the clinic. 1,220 (29%) came from areas in excess of 1½ hours traveling time; while 2,276 (54%) came from areas in excess of 1 hour traveling time. [Stipulation of Uncontested Facts para. 114]

122. If a parent does not have the proper documentation upon his or her visit to a clinic, it may be necessary to reschedule counseling and abortion until a later time. [*See* Stipulation of Uncontested Facts para. 133]

123. An in-person visit by a parent for informed consent may cause delays of several days or possibly weeks, even in cases where the parent is prepared to consent. [*See* Stipulation of Uncontested Facts paras. 108, 110]

124. Delays in obtaining parental consent could be both dangerous and prohibitive since most minors decide to have an abortion much later in their pregnancies than do adults. [*See* Stipulation of Uncontested Facts para. 116]

125. Adolescents as a group are reluctant to establish contact with unfamiliar organizations. Many delay the initial step of calling a clinic until well into their pregnancies. [Stipulation of Uncontested Facts para. 117]

126. Adolescents as a group tend to deny their pregnancies out of guilt and to put off making any decision as to what to do. [Stipulation of Uncontested Facts para. 118]

127. Many adolescents are not aware that they are pregnant for many weeks or months because of ignorance about contraception, their own menstrual cycles, and pregnancy. [Stipulation of Uncontested Facts para. 119]

128. Delays can arise from a minor's fear and hesitation in divulging to her parents that: first, she has been sexually active; second, that she is pregnant, and third, that she wishes to have an abortion. Because of the disruption and trauma caused by such disclosures, a minor will tend to delay telling her parents that she is pregnant for days or even weeks. [Stipulation of Uncontested Facts para. 120]

129. The plaintiff clinics often find themselves having to expedite a minor's testing, counseling and procedure because the minor has delayed going to a clinic until she is near or into the second trimester of pregnancy. [Stipulation of Uncontested Facts para. 121]

130. The fact that many minors delay seeking an abortion until they are near or into the second trimester of pregnancy is in no way related to any action of the Commonwealth.

131. However, the additional costs, burdens and delays incurred by minors and their parents if the parent is required to make an in-person visit to the facility for a counseling session could be extremely burdensome. In some instances, the additional delay or expense may result in a minor's effectively being deprived of her right to have an abortion. [*See* Stipulation of Uncontested Facts para. 115]

132. Publicly available statistics suggest that a delay of one week in the performance of an abortion can increase the risks to the patient from both a mortality and morbidity standpoint. [Stipulation of Uncontested Facts para. 125]

133. Late abortions, particularly second trimester abortions, are more dangerous than early abortions. Risk of hemorrhage or infection increases with each week of delay. [Stipulation of Uncontested Facts para. 123]

134. Later abortions pose greater risks of injury to the uterus and retention of products of contraception. [Stipulation of Uncontested Facts para. 124]

135. Scientific studies have demonstrated that the risk of death caused by abortion increases approximately 40% for each week of delay. C. Tietze, *Induced Abortion: 1979, A Population Council Fact Book* 83 (3d ed., N.Y. Population Council (1979)). [Stipulation of Uncontested Fact para. 126]

136. Because teenagers are more likely to have had no previous dilations of the cervix, later abortions can be an especially dangerous procedure for them. [Stipulation of Uncontested Facts para. 127]

137. Many minors have great difficulty tolerating difficulties and delays in scheduling. They can be fragile emotionally, and they tend to delay the abortion decision because of fear and anxiety. Thus, once having made the decision, they can react very negatively to delay or obstacles to obtaining their abortion. Some may lie about their age; others may give up their attempt to obtain an abortion and carry to term; still others may harm themselves by attempting self-abortion or suicide. [Stipulation of Uncontested Facts para. 128]

138. Adolescents have been documented to have one of the highest suicide rates of any segment of the population. [Stipulation of Uncontested Facts para. 129]

139. 35 Pa.S.A. § 10104 provides:

Medical, dental and health services may be rendered to minors of any age without the consent of a parent or legal guardian when, in the physician's judgment, an attempt to secure consent would result in delay of treatment which would increase the risk to the minor's life or health.

140. Section 3206(b), regarding "Unavailability of parent or guardian," provides:

If both parents have died or are otherwise unavailable to the physician within a reasonable time and in a reasonable manner, consent of the pregnant woman's guardian or guardians shall be sufficient. If the pregnant woman's parents are divorced, consent of the parent having custody shall be sufficient. If neither any parent nor a legal guardian is available to the physician within a reasonable time and in a reasonable manner, consent of any adult person standing in loco parentis shall be sufficient.

141. In part because of the failure to define the terms "reasonable time," "reasonable manner," and "person standing in loco parentis," the plaintiff clinics intend to take a conservative approach in applying section 3206(b). [Stipulation of Uncontested Facts para. 135; Testimony of S. Roselle and S. Stengle]

142. On many occasions, members of the public enter plaintiff clinics posing as clients seeking information about abortion, or claiming to be pregnant and seeking an abortion, in order to scrutinize the procedures and controls in effect at the clinic. [Testimony of S. Roselle and S. Stengle]

143. Plaintiff clinics reasonably fear that members of anti-abortion groups will send minors to the clinic posing as patients in order to test the clinics' compliance with section 3206. [Testimony of S. Roselle]

144. Plaintiff clinics such as WHS and AWC feel that in order to protect themselves and the doctors who work for them

from the risk of the loss of the physician's license or loss of the clinic's permission to operate, and in order to protect themselves from civil suits, they must interpret the parental consent provisions of section 3206 narrowly. [Testimony of S. Roselle and S. Stengle]

145. Many of the plaintiff clinics' patients are minors who live with non-parents, such as aunts, grandmothers or older siblings. Often the arrangement is an informal one rather than a legal guardianship, with the natural parents living in another city and perhaps having abandoned the minor. The clinics intend to be wary of permitting the adult caretaker to consent to the minor's abortion for fear that officials enforcing the Act may find the parents were available in a reasonable time and manner. [Stipulation of Uncontested Facts para. 136]

146. Implementation of the parental consent requirement will cause administrative and scheduling difficulties for the plaintiff clinics, requiring increased expenditures for staff and equipment. [Testimony of S. Roselle; Verifications of J. Green, S. Miller, S. Roselle, S. Stengle and C. Wall. *See* Stipulation of Uncontested Facts paras. 111–112, 137]

147. WSC anticipates that its interpretation of the parental consent provisions will require its adding at least one ¾–time additional counseling position, at a cost of $15,000 per year. [Stipulation of Uncontested Facts para. 138]. The total costs of its interpretation of parental consent implementation for WSC is anticipated to be as high as $40,000 which would be passed on to its clients. [Stipulation of Uncontested Facts para. 139]

148. RHCC anticipates that its interpretation of the parental consent requirements will impose additional costs of approximately $25,000 to $30,000 for counseling and administrative expenses, which will be passed on to clients in the form of higher fees for the clinic services. [Stipulation of Uncontested Facts para. 140]

149. WHS anticipates that its interpretation of the parental consent requirements will impose additional costs of approximate-ly $14,000 per year for one full-time counselor, and $5,000 for additional office equipment. [Testimony of S. Roselle]

150. PPSP believes it will need new and substantial counseling resources to be available for minors themselves who will be reluctant to inform their parents and afraid of the judicial procedure. [Stipulation of Uncontested Facts para. 141]

151. Section 3206 sets forth an alternative to the parental consent requirement for minors seeking an abortion. It provides that a minor may obtain judicial authorization for an abortion by applying to a court of common pleas, which will determine whether she is mature and capable of giving informed consent, 18 Pa.C.S. § 3206(c), or, if she is immature and incapable of consent, whether having an abortion would be in her best interests, 18 Pa.C.S. § 3206(d). [Stipulation of Uncontested Facts para. 142].

152. Section 3206(f)(1), as amended, states:

Court proceedings under this section shall be confidential and shall be given such precedence over other pending matters as will ensure that the court may reach a decision promptly and without delay in order to serve the best interests of the pregnant woman. In no case shall the court of common pleas fail to rule within three business days of the application. A court of common pleas shall make in writing specific factual findings and legal conclusions supporting its decision and shall order a sealed record of the pleadings, submissions, transcripts, exhibits, orders, evidence and any other written material to be maintained which shall include its own findings and conclusions.

153. Section 3206(f)(2), as amended, requires that the minor's application to the court of common pleas be accompanied by a non-notarized verification stating that the information therein is true and correct to the best of the applicant's knowledge, and setting forth, *inter alia*, the minor's initials and age and "[t]he names and address-es of each parent, guardian, or, if the mi-

nor's parents are deceased and no guardian has been appointed, any other person standing in loco parentis to the minor."

154. On April 25, 1988, Emily J. Andelman, an attorney practicing in Pennsylvania and a volunteer for the American Civil Liberties Union of Pennsylvania, contacted by telephone personnel of the courts of common pleas of 14 counties: Allegheny, Beaver, Bedford, Butler, Clarion, Crawford, Fayette, Erie, Greene, Indiana, Lawrence, Mercer, Washington and Westmoreland. The purpose of these communications was to determine the steps taken by these counties' courts to implement the judicial bypass provisions of Act 31. [Stipulation of Uncontested Facts para. 144]

155. For Allegheny County, Andelman spoke with a person identified as an Assistant Court Administrator, who said they had not received notification yet and nothing had come down. The Clerk for the county's Orphans' Court said there were no specific procedures in place or in progress. The law clerk for the Orphans' Court, Paul Stifan, said that he had not heard of any procedures being implemented for the new Act. [Stipulation of Uncontested Facts para. 145]

156. For Beaver County, Andelman spoke with a person identified as the Clerk for the Orphans' Court, who said that nothing had come through yet, and with a person identified as the Clerk of Court who knew nothing about the new Act or the procedures for implementing it. [Stipulation of Uncontested Facts para. 146]

157. For Bedford County, Andelman spoke with Paul Doerner, Court Administrator, who stated that the courts had no specific procedures contemplated or in place. He also said that a girl could always come before the court, but that she should have a lawyer. [Stipulation of Uncontested Facts para. 147]

158. For Butler County, Andelman spoke with a person identified as Clerk for the Orphans' Court, who knew of no procedures in place or contemplated. The Court Administrator, Betty McAnony, said that the bypass procedure had not been discussed and that nothing had been raised about it in the county. [Stipulation of Uncontested Facts para. 148]

159. For Clarion County, Andelman spoke with a person identified as Chief Deputy Clerk for the courts, who said that they had received nothing from the clerk's office concerning procedures for implementing the Act. [Stipulation of Uncontested Facts para. 149]

160. For Crawford County, Andelman spoke with a person identified as clerk Ash of the Orphans' Court, who hadn't heard anything about the procedures for implementing the Act. [Stipulation of Uncontested Facts para. 150]

161. For Fayette County, Andelman spoke with a person identified as Clerk for the Orphans' Court, who said they had done nothing about implementing the Act. The Court Administrator, Mr. Wetzl, said that they had not encountered the situation yet, and while it was speculation at this point, he assumed it would be handled as all petitions are, and that the general Rules of Civil Procedure would apply. [Stipulation of Uncontested Facts para. 151]

162. For Erie County, Andelman spoke with a person identified as the Court Administrator, who did not believe their office would be involved in the matter since the Orphans' Court judge handles everything directly. The judge's secretary knew nothing about the Act or procedures for implementing the Act. [Stipulation of Uncontested Facts para. 152]

163. For Greene County, Andelman spoke with the Orphans' Court clerk, who did not know anything about the Act but, after consultation, guessed such a petition would be a civil action handled by the Prothonotary's Office. A person identified as Court Administrator said that there were no procedures contemplated or in place yet, but perhaps the District Attorney's office would know something. [Stipulation of Uncontested Facts para. 153]

164. For Indiana County, Andelman spoke with a person identified as Court Administrator, who said nothing had yet been set up concerning procedures to im-

plement the Act. [Stipulation of Uncontested Facts para. 154]

165. For Lawrence County, Andelman spoke with a person identified as Clerk in the Prothonotary's Office, who knew nothing about any minor's application under Act 31. [Stipulation of Uncontested Facts para. 155]

166. For Mercer County, Andelman spoke with a person identified as Court Administrator, who said the court would not do anything on its own in a case where a minor girl wanted the court to allow an abortion when her parents would not give their approval; that the court only hears cases brought to it; and that the girl should get a lawyer. [Stipulation of Uncontested Facts para. 156]

167. For Washington County, Andelman spoke with a person identified as the Assistant Court Administrator, who said she had not heard anything about the Act or procedures to implement it. [Stipulation of Uncontested Facts para. 157]

168. For Westmoreland County, Andelman spoke with a person identified as Assistant Court Administrator, who said that to her knowledge, the county had no procedures contemplated or in place as yet. [Stipulation of Uncontested Facts para. 158]

169. On April 15, 1988, Susan W. Shenkin, a Pennsylvania attorney and volunteer for the American Civil Liberties Union of Pennsylvania, contacted by telephone John Miller, Prothonotary of the Court of Common Pleas of Chester County, to determine the steps taken by that court to implement the judicial bypass provisions of Act 31. [Stipulation of Uncontested Facts para. 159]

170. Mr. Miller said that he was unaware of the new provisions and their effective date, and that, accordingly, no steps had been taken by the county's court to implement them. [Stipulation of Uncontested Facts para. 160]

171. On April 15, 1988, Gary S. Gildin, a Pennsylvania attorney and volunteer for the American Civil Liberties Union of Pennsylvania, contacted by telephone the Offices of the Prothonotary for the courts of common pleas for Adams, Cumberland, Dauphin, Lebanon, Perry and York counties. The purpose of his communications was to determine the steps taken by these courts to implement the judicial bypass provisions of Act 31. [Stipulation of Uncontested Facts para. 161]

172. The Office of the Prothonotary of each of these common pleas courts said that no steps had been taken to implement section 3206. [Stipulation of Uncontested Facts para. 162]

173. The Prothonotary of the Court of Common Pleas for Dauphin County told Gildin that requests for judicial approval of a minor's abortion would be treated just like any other lawsuit. [Stipulation of Uncontested Facts para. 163]

174. On April 18, 1988, Donald W. Miles, an attorney licensed to practice in Pennsylvania and a volunteer attorney for the American Civil Liberties Union of Pennsylvania, contacted by telephone the following individuals: Betty Quinter, Prothonotary of the Northampton County Court of Common Pleas; Nancy Noll, Deputy Prothonotary of the Northampton County Court of Common Pleas; Aloyisius Marhefka, Court Administrator of the Northampton County Court of Common Pleas; Richard Dornblaser, Deputy Prothonotary of the Lehigh County Court of Common Pleas; and Daniel Sabetti, Court Administrator of the Lehigh County Court of Common Pleas. [Stipulation of Uncontested Facts para. 164]

175. The purpose of Miles' communications was to determine the steps taken by the common pleas courts of Northampton and Lehigh counties to implement the judicial bypass provisions of Act 31. [Stipulation of Uncontested Facts para. 165]

176. Each of the Northampton and Lehigh court officials with whom he spoke informed Miles that he or she was unaware of the amendments to section 3206 and of the effective date of those amendments. Accordingly, no steps had been taken to implement the provisions. [Stipulation of Uncontested Facts para. 166]

177. On April 18, 1988, Ariadne I. Valsamis, a Field Organizer for the American Civil Liberties Union of Pennsylvania, contacted by telephone personnel of the courts of common pleas of Bucks, Delaware and Montgomery counties to determine what steps the respective courts had taken to implement the judicial bypass provisions of Act 31. [Stipulation of Uncontested Facts para. 167]

178. For Bucks County, Valsamis spoke with the Secretary of the Prothonotary's Office, who said that their office was unaware of the amendments to section 3206 and their effective date and had never read or seen the legislation. Accordingly, she informed Valsamis that no particular steps had been taken by the Court of Common Pleas of Bucks County, and suggested that Valsamis contact Planned Parenthood for information. She then referred Valsamis to Doug Praul, the Assistant Court Administrator, who stated that his office had not seen the new provisions and was unaware of their effective date. He further stated that while no procedures were in place, his office would figure something out if a minor applied. [Stipulation of Uncontested Facts para. 168]

179. For Delaware County, Valsamis spoke with the Secretary of the Office of Judicial Support, who said that the office was not aware of the judicial bypass provisions or their effective date and, accordingly, no steps had been taken by the county court. [Stipulation of Uncontested Facts para. 169]

180. Valsamis also spoke with the Solicitor for Delaware County's Office of Judicial Support, Michael Ehling, who said that he generally gets information from Representative Stephen Freind's press releases, but had not seen the amendments to section 3206 and did not know their effective date. [Stipulation of Uncontested Facts para. 170]

181. Ehling said that he was as pro-life as Representative Freind, but loses track of abortion bills and was unfamiliar with this legislation. He further said that his office would have to handle the applications on an *ad hoc* basis and make arrangements to protect confidentiality. [Stipulation of Uncontested Facts para. 171]

182. Ehling stated that his office had taken no steps to ensure that attorneys would be available to represent applicants and advised Valsamis that in Delaware County, one "would only find attorneys willing to represent the unborn kids." He recommended Valsamis contact Legal Aid because he was not going "to help any kid get an abortion." [Stipulation of Uncontested Facts para. 172]

183. For Montgomery County, Valsamis spoke with the First Deputy Prothonotary, Barbara Acton, who stated that her office had not seen the new amendments and was unaware of their effective date. Accordingly, she informed Valsamis that no particular steps had been taken by the Montgomery County courts to implement the bypass. Acton further stated that she was sure the legislation was on appeal and a court would find it unconstitutional. [Stipulation of Uncontested Facts para. 173]

184. Also for Montgomery County, Valsamis spoke with a Mrs. Reynolds, Secretary of the President Judge, who said that the amendments had not been received by the President Judge's office, that she did not know the effective date, and that no procedures had been discussed. [Stipulation of Uncontested Facts para. 174]

185. On April 15, 1988, Morris N. Slater, a volunteer and member of the American Civil Liberties Union of Pennsylvania, visited the Office of the Prothonotary in the Lackawanna County Courthouse in Scranton, to determine the steps taken by the Court of Common Pleas of Lackawanna County to implement the judicial bypass provisions of Act 31. [Stipulation of Uncontested Facts para. 175]

186. Slater spoke with a clerk who knew nothing about the implementation of the Act and referred him to the Court Administrator. Slater then visited the Deputy Court Administrator, Jim Minella, who said that he had heard of the Act but that no procedures, forms, or guidelines had been prepared to implement its provisions. He suggested that Slater contact the local

office of Legal Aid. [Stipulation of Uncontested Facts para. 176]

187. Slater then visited the office of President Judge Walsh, where he met with Paul Kelly, a law clerk to Judge Walsh. Kelly stated that while he was aware of the bypass provisions, he knew of no procedures, forms, guidelines or means of ensuring anonymity that had been implemented. He further stated that while it was possible that such guidelines had been set up without his knowledge, it was unlikely. He suggested that a minor seeking judicial consent for an abortion under the new amendments contact Legal Services, where an attorney could petition for an injunction or declaratory judgment. As to the Act's requirement for expeditious action, Kelly said he really did not know what would happen "until it happens." [Stipulation of Uncontested Facts para. 177]

188. On April 18, 1988, Betsy Gaunt, Manager of Planned Parenthood of Northeast Pennsylvania and a volunteer for the American Civil Liberties Union, contacted Joyce Reese, Prothonotary of Monroe County Court of Common Pleas, to determine what steps had been taken to implement the judicial bypass provisions of Act 31. Ms. Reese told Gaunt that no steps whatsoever had been taken to implement the Act, and that, in fact, the office had never seen the Act, had received no instructions on the matter, and knew nothing about it. [Stipulation of Uncontested Facts para. 178]

189. On April 15, 1988, Sherri Veglia, Community Educator for Planned Parenthood of Northeast Pennsylvania and a volunteer for the American Civil Liberties Union of Pennsylvania, visited the Office of the Prothonotary at the Luzerne County Courthouse to determine what steps that county's courts had taken to implement the judicial bypass provisions of Act 31. [Stipulation of Uncontested Facts para. 179]

190. Veglia spoke with Tom Merrel, Deputy Prothonotary, who said that he was not sure who would handle such matters and initially directed Veglia to an office where "they do all the processing of job applicants." Upon further explanation, Merrel stated that he did not know anything about the Act and the bypass provisions, and further queried whether this was a civil or criminal matter. If it is civil, he stated, he guessed his office would be handling it. He directed Veglia to the Clerk of Courts or the Orphans' Court, because they might know something about the new Act. [Stipulation of Uncontested Facts para. 180]

191. On April 18, 1988, Barry Steinhardt, Executive Director of the American Civil Liberties Union of Pennsylvania and an attorney licensed to practice in Massachusetts, contacted by telephone the office of Nicholas A. Cipriani, Administrative Judge, Family Court Division, Philadelphia County Court of Common Pleas, to determine whether his office had prepared guidelines in conformity with Act 31. [Stipulation of Uncontested Facts para. 181]

192. On April 19, 1988, Steinhardt spoke to Andrea Hoffman, Executive Coordinator of the Family Court, who stated that she would bring the matter to the attention of the judge, and would supply Steinhardt with the information sought. [Stipulation of Uncontested Facts para. 182]

193. On April 20, 1988, Ms. Hoffman telephoned Steinhardt to inform him that she had discussed the matter with Judge Cipriani. She stated that while their office was aware of Act 31's requirements, they had not presently adopted any procedures to implement them. She said that they were in the process of looking at the statute and at the procedure they had developed for Act 31's predecessor, which had never gone into effect. Ms. Hoffman concluded by stating that at this time, she could not say what procedures would be created. [Stipulation of Uncontested Facts para. 183]

194. On April 15, 1988, James N. Bucci, an attorney practicing in Pennsylvania and a volunteer for the American Civil Liberties Union of Pennsylvania, contacted by telephone Mike Natale of the Orphans' Court Division of the Court of Common Pleas of Berks County, and an official in the Pro-

thonotary's Office of Berks County. The purpose of Bucci's communications was to determine the steps taken by the Court of Common Pleas of Berks County to implement the judicial bypass provisions of Act 31. [Stipulation of Uncontested Facts para. 184]

195. Both individuals informed Bucci that they were unaware of the amendments to section 3206 and of their effective date. Accordingly, no particular steps had been taken by the Berks County court to implement that section. [Stipulation of Uncontested Facts para. 185]

196. In making their contacts with personnel of the various courts of common pleas in Pennsylvania during the second and third weeks of April, 1988, the ACLU volunteers did not speak directly to the president judges of the courts. [Stipulation of Uncontested Facts para. 186]

197. No rules have been issued by the Supreme Court of Pennsylvania for implementing the judicial bypass procedures of Act 31. [Stipulation of Uncontested Facts para. 187]

198. Rule 16 of the Pennsylvania Orphans' Court Rules, adopted by the Pennsylvania Supreme Court in November, 1984, has not been rescinded by the Pennsylvania Supreme Court. [Stipulation of Uncontested Facts para. 188]

199. The provisions of section 3206 relating to the judicial bypass procedure are, on their face, self-executing.

200. On May 2, 1988, Charles W. Johns, Chief Legal Counsel to the Court Administrator of Pennsylvania, wrote to all president judges of the Courts of Common Pleas, providing them with a copy of section 3206 and pointing out that 1) section 3206 provides, *inter alia,* that the proceedings before the Court are of a confidential nature and require accelerated disposition; and 2) that the new Act differs in some respects from Pennsylvania Orphans' Court Rule 16. The letter requests that "Judges within your Judicial District as well as the Court Administrator be apprised of the requirements of Act 31." [Defendants' Supplemental Exhibit 5]

201. If the judicial bypass provisions are implemented, many of the clinics intend to assist minors in navigating their way through the judicial process, at a consequent increase in staffing and costs. [Stipulation of Uncontested Facts para. 189]

202. Clinics such as the AWC would pass the increased expenses along in the form of higher fees for all of its patients, rather than only to those minors requiring assistance. [Stipulation of Uncontested Facts para. 190]

203. Section 3207(b), as amended, provides:

Within 30 days after the effective date of this chapter, every facility at which abortions are performed shall file, and update immediately upon any change, a report with the department, containing the following information:

(1) Name and address of the facility.

(2) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations.

(3) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations having contemporaneous commonality of ownership, beneficial interest, directorship or officership with any other facility.

The information contained in those reports which are filed pursuant to this subsection by facilities which receive State appropriated funds during the 12-calendar-month period immediately preceding a request to inspect or copy such reports shall be deemed public information. Reports filed by facilities which do not receive State appropriated funds shall only be available to law enforcement officials, the State Board of Medicine and the State Board of Osteopathic Medicine for use in the performance of their official duties. Any facility failing to comply with the provisions of this subsection shall be assessed by the department a fine of $500 for each day it is in violation hereof.

204. Section 3214(f), as amended, provides:

Every facility in which an abortion is performed within this Commonwealth

during any quarter year shall file with the department a report showing the total number of abortions performed within the hospital or other facility during that quarter year. This report shall also show the total abortions performed in each trimester of pregnancy. Any report shall be available for public inspection and copying only if the facility receives State appropriated funds within the 12–calendar–month period immediately preceding the filing of the report. These reports shall be submitted on a form prescribed by the department which will enable a facility to indicate whether or not it is receiving State appropriated funds. If the facility indicates on the form that it is not receiving state appropriated funds, the department shall regard its report as confidential unless it receives other evidence which causes it to conclude that the facility receives State appropriated funds.

205. Records of state appropriations and expenditures are maintained and are generally available at the present time under Pennsylvania's Right-to-Know Law, 65 P.S. §§ 66.1–66.4, unless the information fits within the exceptions enumerated in that statute. [Stipulation of Uncontested Facts para. 193]

206. Facilities at which abortions are performed, including the plaintiff clinics, traditionally have received funding in the form of Medicaid payments for a narrow class of abortions still qualifying for Medicaid in Pennsylvania, viz., abortions for victims of incest and rape and for women with life-threatening conditions. [Stipulation of Uncontested Facts para. 195]

207. In 1987, AWC, which serves approximately 350 patients a month, received less than $4,000 in medical assistance funds. [Stipulation of Uncontested Facts paras. 58, 196]

208. WSC, which performs approximately 3,350 first trimester abortions a year, submits approximately 40 claims per year to the state for reimbursement of abortion services. [Stipulation of Uncontested Facts paras. 42, 197]

209. RHCC, which performs approximately 2,900 abortions per year, was reimbursed by state medical assistance for no more than 20 abortions in 1987. The reimbursement rate was $59.50 to the clinic and $81.50 to the physician. [Stipulation of Uncontested Facts paras. 15, 198]

210. PPSP, which performs approximately 2,800 abortions a year, was reimbursed by state medical assistance for approximately 53 abortions in 1987. [Stipulation of Uncontested Facts paras. 5, 199]

211. In 1987, WHS, which has 3,000 client contacts a month, received medical assistance reimbursement for 249 patients. [Stipulation of Uncontested Facts paras. 28, 200]

212. PPSP receives state appropriated funds for contraceptive services and for AIDS-related HIV testing and counseling. [Stipulation of Uncontested Facts para. 201]

213. In March of 1988, WHS contracted for state appropriated federal funding of HIV testing and counseling for clients in high risk groups for exposure to AIDS. Before that time, WHS had been offering HIV testing and counseling for a small fee. [Stipulation of Uncontested Facts para. 202]

214. Had WHS known of the disclosure implications of accepting state appropriated funds, it believes it would have declined to enter into such contracts. [Stipulation of Uncontested Facts para. 203]

215. All of the plaintiff clinics receiving state appropriated funds apply the funds only to the services for which they are allocated. [Stipulation of Uncontested Facts para. 204]

216. An Alan Guttmacher Institute survey of all abortion providers in the United States in 1986 found harassment by opponents of abortion to be common. Of the 927 non-hospital facilities answering the questions, 61% had experienced some form of harassment during the previous year. Of the non-hospital providers that had performed 400 or more abortions in 1985, 48% reported having had bomb threats, 47% physical contact with or blocking of pa-

tients by demonstrators, and 28% reported having experienced vandalism. Many also reported other types of illegal activity by opponents of abortion. [Stipulation of Uncontested Facts para. 206]

217. RHCC has experienced invasions by anti-abortion protestors at least once a year, and has experienced intense verbal harassment and taunting of its staff and clients every abortion procedure day, as well as every Saturday. [Stipulation of Uncontested Facts para. 207]

218. WHS has had numerous experiences of harassment and violence by anti-abortion groups. On many occasions, WHS personnel have discovered anti-abortion advocates going through their trash to find information that could be put to use in their protesting activity. [Stipulation of Uncontested Facts para. 208]

219. Within the last five years at PPSP in Philadelphia, the clinic has experienced numerous bomb threats, as well as telephone and in-person threats. Every Saturday for these five years, PPSP's staff and patients have been the target of picketing outside the clinic. [Stipulation of Uncontested Facts para. 209]

220. On December 6, 1986, more than 125 demonstrators blocked access to PPSP's building for approximately three hours. The clinic's operations were disrupted for much of the day and physicians could not get into the building. One physician became trapped in the midst of a jeering and pushing crowd of anti-abortion activists. Other members of PPSP's staff were jostled and bruised. Approximately 25 demonstrators were arrested. [Stipulation of Uncontested Facts para. 210]

221. Anti-abortion harassment incidents occur at most facilities providing abortion services. [Stipulation of Uncontested Facts para. 211]

222. There is no evidence in the present record to suggest that anti-abortion harassment incidents have significantly decreased in the last three years.

223. Anti-abortion harassment is not generally limited to staff members. Patients also find themselves being jeered, abused and heckled as they attempt to enter an abortion facility. [Stipulation of Uncontested Facts para. 212]

224. In many instances, patients who have been subjected to harassment at a facility's entry arrive in distraught mental states which, in turn, may affect their medical condition. [Stipulation of Uncontested Facts para. 213]

225. Clinics such as WHS, which has been targeted with harassment, have been told of women who were deterred and intimidated from going to the clinic for fear that the abortion procedure itself might be interrupted by demonstrations, bomb scares and verbal abuse. [Stipulation of Uncontested Facts para. 214]

226. Some anti-abortion activities adversely affect the ability of abortion facilities to operate their businesses and offer services to the public. They may deter all of the clinics' clients, including those seeking contraceptive counseling or AIDS testing. [Stipulation of Uncontested Facts para. 215]

227. Because facilities at which abortion services and counseling are offered are subject to harassment and violence, plaintiff clinics are concerned that their reports will be open for public inspection and copying under sections 3207(b) and 3214(f). [Verifications of J. Green, S. Miller, S. Roselle, S. Stengle and C. Wall; Stipulation of Uncontested Facts para. 205]

228. Plaintiff clinics believe that the disclosure required by sections 3207(b) and 3214(f) of Act 31 will result in increased threats, harassment, or reprisals upon abortion facilities. [Stipulation of Uncontested Facts para. 216]

229. I find plaintiff clinics' fears of increased harassment if these reports are subject to public inspection to be reasonable.

230. Because of its concern with public disclosure of reports filed with the Pennsylvania Department of Health, AWC has determined that upon implementation of Act 31, it will stop accepting all state appropriated funds, including medical assistance funds for poverty level women. This deter-

mination by AWC would mean that AWC will have to insist that patients who are on medical assistance pay for AWC's services or be turned away. [Stipulation of Uncontested Facts para. 217]

231. I find it is likely that facilities will refuse to accept patients who are on medical assistance to avoid the necessity of filing these forms. The likely result will be that indigent patients who have been the victims of rape or incest or who suffer from life-threatening conditions will find it very difficult, or nearly impossible, to attain abortion services.

232. As to reports filed by the clinics in the 12–month period immediately preceding the enactment of Act 31, I find that if the plaintiff clinics had known that these reports would become subject to public disclosure, they would have seriously considered discontinuing acceptance of medical assistance and other state-appropriated funds in order to preserve the confidentiality of these already-filed reports. [Verifications of J. Green, S. Miller, S. Roselle, S. Stengle and C. Wall]

233. Section 3214(a) states:

*General Rule.* For the purpose of promotion of maternal health and life by adding to the sum of medical and public health knowledge through the compilation of relevant data, and to promote the Commonwealth's interest in protection of the viable unborn child, a report of each abortion performed shall be made to the [Department of Health of the Commonwealth of Pennsylvania] on forms prescribed by it. The report forms shall not identify the individual patient by name and shall include the following information:

(1) Identification of the physician who performed the abortion and the facility where the abortion was performed and of the referring physician, agency or service, if any.

(2) The county and state in which the woman resides.

(3) The woman's age.

(4) The number of prior pregnancies and prior abortions of the woman.

(5) The probable gestational age of the unborn child.

(6) The type of procedure performed or prescribed and the date of the abortion.

(7) Medical complications of the pregnancy, if any, including but not limited to, rubella disease, hydatid mole,[3] endocervical polyp and malignancies, and, if known, any medical complication which resulted from the abortion itself.

(8) The information required to be reported under Section 3211(a) (relating to viability).

(9) The length and weight of the aborted unborn child for any abortion performed subsequent to the first 19 weeks of pregnancy.

(10) Basis for any medical judgment that a medical emergency existed as required by any part of this chapter.

(11) The information required to be reported under Section 3210(b) (relating to abortion after viability).

234. In the opinion of Stanley K. Henshaw, Ph.D., the requirement that the identity of the referring physician or agency be reported serves no scientific purpose. [Verification of S. Henshaw] No other state collects this information. [Stipulation of Uncontested Facts para. 222]

235. The Commonwealth asserts that the identity of the referring physician or agency is needed because the referring physician often provides post-abortion care and may, therefore, have follow-up information. [Memorandum in response to motion for preliminary injunction at 13]

236. One use of the identification of the attending physician is to query for missing or additional information. [Stipulation of Uncontested Facts para. 261]

237. Plaintiffs believe that because the name of the facility will be stated on report forms filed pursuant to section 3214(a)(1), there is no additional scientific or statistical

3. Presumably, this reference to "hydatid mole" is meant to refer to hydatidiform moles, which along with rubella, are listed on all birth certificates at the present time. [Stipulation of Uncontested Facts P 221]

need for requiring that the name of the physician who performed the abortion be reported. The patient records at that facility will contain the name of the attending physician and, in the event public officials have a need for that information, it could be secured from the facility. [Stipulation of Uncontested Facts para. 223]

238. Plaintiffs believe there is a possibility that the names of physicians who report that they perform abortions could become public, and that this risk may degrade the statistical accuracy of the abortion reports because some physicians may decide not to report. Abortion reporting is generally incomplete, even in states that require such reporting, in part because abortion providers fear that the information will become public. [Stipulation of Uncontested Facts para. 224]

239. No state releases information about individual physicians who perform abortions. [Stipulation of Uncontested Facts para. 225]

240. Some physicians have been the subject of the harassment techniques of anti-abortion demonstrators. As a result of such threats, some physicians have ceased performing abortions. [Stipulation of Uncontested Facts para. 226]

241. Should the names of physicians who perform abortions or refer pregnant women to another physician or facility for the procedure become publicly available information, some will cease performing abortions and referring patients for the procedure. [Verification of Dr. Hochman]

242. Indeed, some referring and performing physicians have advised the plaintiff clinics that if their names appear on any report, regardless of whether this information becomes publicly available, they will cease performing abortions or referring patients to the clinics. [Testimony of S. Roselle and S. Stengle]

243. Many physicians who refer patients for abortions to WHS are extremely protective of their anonymity because of fears (often based on past experience) that any kind of documentation or recordkeeping connecting them with any phase of the abortion decision could have adverse effects on their medical practices or their ability to reside peacefully in their communities. [Testimony of S. Roselle; Verification of S. Roselle]

244. There are two medical doctors who, although they do not perform abortions, refer clients to WHS for abortions on the strict condition that WHS not use their names in any of its reports. They insist upon this because, in the past, each has been subjected to public abuse, picketing and pamphleteering based on their having performed or referred abortions during their medical residencies. [Stipulation of Uncontested Facts para. 230]

245. Under no circumstances would either doctor refer any patients to WHS or any other clinic for abortion if his name is reported under section 3214(a), even if there were no risk of public disclosure of the report. The requirement that their names appear on reports filed with a Commonwealth agency is sufficient, based on their past experience, to deter them from making any future referrals. [Verification of S. Roselle; Testimony of S. Roselle]

246. Several of AWC's present referring physicians will not permit the clinic to send correspondence to their offices for fear that members of their own staffs will divulge to anti-abortion groups that they refer patients for abortions. One physician told AWC's Director, Sylvia Stengle, that the new recordkeeping provisions of section 3214 would mean that many doctors will stop referring for abortions altogether. [Stipulation of Uncontested Facts para. 231]

247. If doctors who have previously referred for abortions stop doing so, patients coming to these doctors for help would have to go elsewhere for information about AWC or similar facilities. [Verification of S. Stengle]

248. Another doctor who performed abortions for AWC in the past has said that in light of the new Act, he would not consider working for AWC any longer for fear of public exposure and harassment. At one time, this doctor had performed abortions in his private practice but stopped

doing so after receiving threats that anti-abortionists would begin picketing his home. [Stipulation of Uncontested Facts para. 232]

249. A third doctor who stopped performing abortions because of threats from anti-abortionists has said that he, too, would be unwilling to refer patients to AWC for fear of reprisal and harassment. He also stated his belief that local hospitals, in order to preserve the confidentiality of their records, will stop performing abortions, and that private doctors who perform abortions will stop accepting patients on state medical assistance. [Stipulation of Uncontested Facts para. 233]

250. All of the plaintiff clinics expect that if the reporting requirements are implemented, many of their present referring and performing physicians will terminate their relationship with the clinics to avoid the perceived risk of increased harassment and threats. [Stipulation of Uncontested Facts para. 234]

251. The evidence of record persuades me that the expectation that referring physicians and, to a lesser extent, performing physicians will terminate their relationship with the clinics is reasonable.

252. The Division of Health Statistics and Research of the Pennsylvania Department of Health contains two major sections. The statistical support services section assists in collecting data, producing statistical reports, and assisting individuals and groups with data requests. The statistical registry section includes the cancer registry, the vital statistics cooperative program, and annual surveys of hospitals, nursing homes, and similar facilities. [Stipulation of Uncontested Facts para. 238]

253. The Health Statistics Division is responsible for preparing forms and gathering data about induced terminations of pregnancy. [Stipulation of Uncontested Facts para. 239]

254. The federal government, through the National Center for Health Statistics, United States Public Health Service, Department of Health and Human Services [hereinafter National Health Center] has prepared a "Standard Report of Induced Termination of Pregnancy" [hereinafter Federal Standard Report] which is intended to serve as a model for use by the states in gathering such data. [Stipulation of Uncontested Facts para. 240]

255. A true and correct copy of the National Health Center's January, 1988 "Handbook on the Reporting of Induced Termination of Pregnancy" [hereinafter Federal Handbook], which is intended to serve as a model for adaptation by any vital statistics registration area and describes and explains the Federal Standard Report, is attached as Exhibit A to Dr. Potrzebowski's affidavit and has been admitted in evidence. [Stipulation of Uncontested Facts para. 241]

256. The Federal Handbook states that the Federal Standard Report is revised periodically in collaboration with state health officials, registrars, and statisticians; federal agencies; and other providers or users of vital statistics, including physicians, local registrars, and medical record personnel. [Stipulation of Uncontested Facts para. 242; Federal Handbook at 2] The Federal Handbook further states that it pertains to the 1989 revision of the U.S. Standard Report of Induced Termination of Pregnancy. [Federal Handbook at 6]

257. The Federal Handbook states that each item included in the Federal Standard Report is evaluated thoroughly for its registration, statistical, health and research value. [Stipulation of Uncontested Facts para. 243; Federal Handbook at 2]

258. Pennsylvania's "Report of Induced Termination of Pregnancy," [hereinafter Pennsylvania Report] is attached as Exhibit B to Dr. Potrzebowski's affidavit and has been admitted in evidence. The Pennsylvania Report is nearly identical to the Federal Standard Report, other than requiring some additional information required by state law. [Stipulation of Uncontested Facts para. 244]

259. Both the Pennsylvania Report and the Federal Standard Report require identification of the facility where the induced termination of pregnancy occurs. The identity of the facility provides information

about the types of facilities where induced terminations are performed. When combined with the location of the facility by town and country, this information may be used in the planning of health facilities and health education programs. The facility name may also assist when inquiries are necessary to obtain missing information. [Stipulation of Uncontested Facts para. 245]

260. Plaintiffs do not challenge the requirement that the name of the facility be reported. [*See* Complaint; Motion for Preliminary Injunction]

261. Both the Pennsylvania Report and the Federal Standard Report request the following information not required by Pennsylvania law: marital status, Hispanic origin, race, education, and date of last normal menses. They also seek information regarding previous pregnancies, broken down whether live births, spontaneous terminations, or induced terminations. [Supplemental Declaration of P. Potrzebowski]

262. Act 31 expressly amended the Act to delete from section 3214(a) the requirement that the facility report the patient's marital status and race, and the date of her last normal menses. These are the only elements of "the woman's personal history," *see Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 766, 106 S.Ct. 2169, 2181, 90 L.Ed.2d 779 (1986), which have been deleted from the Act.

263. The Health Department's stated purpose in requesting this information is to obtain demographic and/or socio-economic status information that is useful to researchers in examining fertility rates and for family planning. [Supplemental Declaration of P. Potrzebowski] This purpose is not directed to the preservation of maternal health.

264. The Health Statistics Division recognizes that this information is not required by law, but maintains that it is authorized to seek more information than is required by law.

265. Among the items of information required on the Pennsylvania Report but not included on the Federal Standard Report are: name of referring physician, length and weight of the fetus, and medical complications of pregnancy. [Federal Handbook at App. A; Pennsylvania Report]

266. Section 15 on the Pennsylvania Report, lists five categories of "medical complications of pregnancy." The first four are specific conditions [4] which may or may not coexist with pregnancy and may or may not lead to a decision to terminate the pregnancy. [Testimony of Dr. Dratman] The remaining category is "complication resulting from termination (Specify)." [Pennsylvania Report]

267. There are many conditions which, like rubella or malignancies, may coexist with pregnancy and be considered complications of pregnancy. These conditions include cardiac disease, hypertension, renal disease, connective tissue disease, and cardiomyopathy. [Testimony of Dr. Dratman] No separate space is provided on the form to list these complications of pregnancy. [Pennsylvania Report] Therefore, I find it probable that these complications will be reported as "complications resulting from termination," and be included in the Department of Health records as complications of abortions.

268. Section 3214(a)(9) requires that every report of an abortion performed subsequent to the first 19 weeks of pregnancy state the length and weight of the aborted fetus. Although the previous version of this subsection contained the words, "when measurable," those words have been deleted under Act 31. [Stipulation of Uncontested Facts para. 286]

269. It is the opinion of Dr. Dratman that, in the rare instances where an abortion must be performed after the 19th week of pregnancy, the safest and most appropriate procedure is usually a dilation and evacuation ("D & E"), which involves dilating the cervix and evacuating the uter-

---

**4.** These conditions are: rubella, hydatid mole, endocervical polyp, and malignancies. [Pennsylvania Report] These four conditions are specifically listed in section 3214(a)(7).

us. However, by the very nature of this procedure, measurement of the length of the evacuated fetus is impossible. [Stipulation of Uncontested Facts para. 287]

270. There are at least three methods by which abortion of an intact fetus may be achieved: 1) saline amniocentesis (injection of saline into amniotic sac to induce labor); 2) urea (injection of urea into amniotic sac to induce labor); and 3) prostaglandin (injection of hormones into amniotic sac or provision by vaginal suppository to induce labor). Each of these methods may have risks that far exceed those of the D & E. [Stipulation of Uncontested Facts para. 288]

271. A D & E performed after 19 weeks is generally not a one day procedure because it requires placement of laminaria to increase the dilation of the cervix over time.[5] However, the surgical process itself is considerably shorter. [Testimony of Dr. Dratman]

272. While a D & E generally takes less than one hour, complete evacuation by the other three methods takes 24 hours or longer, during which the woman may suffer numerous unpleasant side effects. [Stipulation of Uncontested Facts para. 289]

273. Thus, the requirement that the length and weight of the aborted fetus be reported for all abortions performed subsequent to 19 weeks may significantly interfere with the physician's judgment that a D & E is the most appropriate abortion procedure for his or her patient, and may infringe upon the physician's discretion to employ the safest abortion procedure under the circumstances.

274. All abortion facilities have been provided with instructions for the completion of the Pennsylvania Report. [*See* Plaintiffs' Exhibit U] However, the in-

structions do not address all of plaintiff clinics' questions regarding these forms.[6] [Testimony of S. Roselle] The instructions directed the clinics to contact Assistant Counsel Kenneth . E. Brody if they had questions concerning the forms. [Plaintiffs' Exhibit U] However, when Sue Roselle of WHS attempted to obtain information from that office, the Assistant Counsel refused to take her call. [Testimony of S. Roselle]

275. Reports prepared pursuant to section 3214(a) must be signed by the physician who performed the abortion. § 3214(b). Plaintiff clinics complain that a requirement that the physician sign the facility report has greatly increased the administrative burden on the clinics because clerical personnel who complete the forms must then take the form to the physician's private office for review and signature. [Testimony of S. Roselle]

276. Section 3214(h), as amended, provides:

*Reports of complications.* Every physician who is called upon to provide medical care or treatment to a woman who is in need of medical care because of a complication or complications resulting, in the good faith judgment of the physician, from having undergone an abortion or attempted abortion shall prepare a report thereof and file the report with the [Department of Health of the Commonwealth of Pennsylvania] within 30 days of the date of his first examination of the woman, which report shall be on forms prescribed by the department, which forms shall contain the following information, as received, and such other information except the name of the patient as the department may from time to time require:

(1) Age of patient.

[Testimony of S. Roselle] During this litigation, the Commonwealth has put forth evidence that the Health Statistics Division will accept such answers as "unknown" in response to the type of abortion procedures previously used, or address of the facility where the abortion was performed. [Supplementary Declaration of P. Potrzebowski]

---

5. Laminaria eliminate the need for forcible dilation of the cervix, which can increase the risk of later premature births. [Testimony of Dr. Dratman]

6. One of the plaintiff clinics' questions regarding completion of this form concerns the proper procedure if information is not available, or if the patient refuses to provide the information.

(2) Number of pregnancies patient may have had prior to the abortion.

(3) Number and type of abortions patient may have had prior to this abortion.

(4) Name and address of the facility where the abortion was performed.

(5) Gestational age of the unborn child at the time of the abortion, if known.

(6) Type of abortion performed, if known.

(7) Nature of complication or complications.

(8) Medical treatment given.

(9) The nature and extent, if known, of any permanent condition caused by the complications.

277. Uniform definitions of complications are difficult to achieve, and the provider is often unaware of complications that appear after the patient has left the facility. Meaningful comparisons between facilities and geographic areas are difficult to make with complications data from reporting forms. [Stipulation of Uncontested Facts para. 247]

278. A woman who undergoes an abortion may suffer physical complications from the procedure including but not limited to: hemorrhage, infection, blood clots, uterine perforation, and cervical perforation. These conditions may lead to permanent physical impairment or death if not properly treated. [Stipulation of Uncontested Facts para. 248]

279. Studies have shown that a first trimester abortion is one of the safest surgical procedures in existence—having one-half the death rate of tonsillectomies, and $\frac{1}{100}$ the death rate of appendectomies. [Stipulation of Uncontested Facts para. 252]

280. The rate of mortality associated with first trimester abortions in the United States from 1972–1978 was 0.4 per 100,000 at eight weeks or less gestation and 1.0 per 100,000 at eleven to twelve weeks of gestation, while the rate of birth-related mortality was approximately 11.8 per 100,000. [Stipulation of Uncontested Facts para. 249]

281. If a patient is treated by more than one physician, a single abortion complication may be reported by two or more treating physicians pursuant to section 3214(h). Since these reports omit the identity of the patient, they cannot be matched with complications reports filed by other physicians or with the abortion report filed by the facility in which the abortion was performed. [Stipulation of Uncontested Facts para. 250]

282. No other surgical procedure in Pennsylvania has a complications reporting requirement. [Stipulation of Uncontested Facts para. 251]

283. There have been several reported instances in which women who had first trimester abortions experienced bleeding after the procedure. Upon seeking treatment, they were diagnosed as having retained pregnancy tissue (which would be considered a "complication" requiring treatment) and were treated accordingly. Yet, the correct discharge diagnosis from the pathology report would have been decidual endometrial tissue, which is not a "complication" at all. [Stipulation of Uncontested Facts para. 253]

284. Some women are hesitant to tell a physician, at least initially, that they have had an abortion because of the stigma and harassment emanating from anti-abortionists or because of the reporting procedures required under the Act. [Stipulation of Uncontested Facts para. 254]

285. Other women may delay going to a doctor for treatment of a complication following abortion because of a sense of guilt or fear of reprisal and stigmatization. In these instances, what might be a simple, easily-treatable condition could, because of the delay, progress into a serious medical complication that could be reported as a complication resulting from the abortion. [Stipulation of Uncontested Facts para. 255]

286. Dr. Dratman reports of a young woman who went to a hospital emergency room after she began bleeding following an abortion. She did not tell the doctors that she had just had an abortion. They performed a D & C operation because they

believed that she was having a miscarriage. Upon performing the D & C, they found that there was no fetal tissue. They then assumed that she had an ectopic pregnancy. The doctors immediately performed a laparoscopy.[7] The risks of this surgical procedure include perforation of the bowel, the bladder or the aorta. Had the woman informed the physicians at the outset that she had just had an abortion, such unnecessary surgery and the risks attending it would have been avoided. [Stipulation of Uncontested Facts para. 256] Had complications resulted from the surgical procedure, they might have been reported as "post-abortion complications."

287. Complications reports must also include the name and address of the provider of the abortion. The reports themselves will not be open to the public. [Stipulation of Uncontested Facts para. 258]

288. Pennsylvania's form "Abortions: Report of Complications" is attached as Exhibit C to Dr. Potrzebowski's supplementary declaration and has been admitted in evidence. It requires, *inter alia*, information regarding previous pregnancies, broken down into live births, spontaneous terminations, and induced terminations.

289. Section 3214(e)(1) and (2) state:

(1) The department shall prepare a comprehensive annual statistical report for the General Assembly based upon the data gathered under subsections (a) and (h). Such report shall not lead to the disclosure of the identity of any person filing a report or about whom a report is filed, and shall be available for public inspection and copying.

(2) Reports filed pursuant to subsection (a) or (h) shall not be deemed public records within the meaning of that term as defined by the Act of June 21, 1957 (P.L. 390, No. 212), referred to as the Right–To–Know Law, and shall remain confidential, except that disclosure may be made to law enforcement officials upon an order of a court of common pleas after application showing good cause therefor. The court may condition

disclosure of the information upon any appropriate safeguards it may impose.

290. Plaintiffs believe that, under the language of section 3214(e)(1), the department would reveal the identity of the facility or the physician who performed the abortion and thereby subject them to unfair criticism and harassment for performing "unsafe" abortions resulting in "complications" that may not even be complications. [Stipulation of Uncontested Facts para. 260]

291. Both the Pennsylvania Report and the Federal Standard Report require identification of the attending physician. As already noted, one use of this information is to query for missing or additional information. [Stipulation of Uncontested Facts paras. 261, 226]

292. The Health Statistics Division is responsible for preparing the comprehensive annual statistical report required by section 3214(e)(1). It is the intention of Dr. Potrzebowski, as Director of the Health Statistics Division, that this report will not identify the names of the attending or referring physician, or the names of the facilities in which abortions are performed. [Stipulation of Uncontested Facts para. 262]

293. By state law, the Health Statistics Division is directed to gather data and maintain such data's confidentiality in areas other than abortion. For example, records must be kept confidential, other than in limited, strictly supervised exceptions, under the Disease Prevention and Control Law of 1955 (35 P.S. § 521.15); the Vital Statistics Law of 1953 (35 P.S. §§ 450.801, 450.805); and the Pennsylvania Cancer Control, Prevention and Research Act (35 P.S. § 5636). [Stipulation of Uncontested Facts para. 263]

294. A "Policies and Procedures for Confidentiality and Data Release" handbook, which is attached as Exhibit C to Dr. Potrzebowski's affidavit and has been admitted in evidence, governs the non-release of confidential information by the Health

---

**7.** A laparoscopy is a procedure in which an instrument is inserted just below the navel so as to observe the contents of the abdomen and to locate the mass.

Statistics Division. [Stipulation of Uncontested Facts para. 264] .

295. Except as authorized by law, Dr. Potrzebowski, as Director of the Health Statistics Division, does not intend to release information collected pursuant to sections 3214(a) and (h), identifying the attending or referring physicians, the facility in which the abortion is performed, or any identifying information concerning the woman having the abortion, either individually or within the comprehensive annual statistical report. [Stipulation of Uncontested Facts para. 265]

296. Apart from plaintiffs' interpretation of the language of the statute, there is no evidence in the record to suggest that such information will be released, either individually or within the annual statistical report.

297. Section 3211(a) states:

*Determination of viability.* Except in the case of a medical emergency, prior to performing any abortion upon a woman subsequent to her first 19 weeks of pregnancy, the physician shall determine whether, in his good faith judgment, the child is viable. When the physician has determined that a child is viable, he shall, pursuant to section 3214(a) (relating to reporting), report the basis for his determination that the abortion is necessary to preserve maternal life or health. When the physician has determined that a child is not viable after the first 19 weeks of pregnancy, he shall report the basis for such determination pursuant to section 3214(a).

298. Gestational age can be measured in terms of the number of weeks since the first day of the last normal menstrual period ("menstrual weeks"). [Stipulation of Uncontested Facts para. 276]

299. Gestational age can also be measured in terms of the number of weeks since the time of conception ("gestational weeks"). [Testimony of Dr. Dratman]

300. Since conception cannot occur until ovulation, age measured by "gestational weeks" will, on the average, be approximately two weeks less than "menstrual weeks". [Testimony of Dr. Dratman]

301. Gestational age is most commonly measured in menstrual weeks. [Testimony of Dr. Dratman] That standard was used in the testimony during the hearing on the motion for preliminary injunction and, unless otherwise specified, will be used in these findings of fact.

302. Survival at 23 to 24 weeks is an extremely rare occurrence. [Stipulation of Uncontested Facts para. 266]

303. Some medical studies suggest that 23½ to 24 weeks gestation is the earliest point in pregnancy at which there is a reasonable possibility of viability. Gerdes, et al., *Improved Survival and Short-term Outcome of Inborn "Micropremies",* 25 Clinical Pediatrics 391, 393 (1986); Pleasure, et al., *What is the Lower Limit of Viability?,* 138 American Journal of Diseases for Children 783 (1984); Buckwald, et al., *Mortality and Follow-up Data for Neonates Weighing 500–800 g at Birth,* 38 American Journal of Diseases for Children 779 (1984). [Stipulation of Uncontested Facts para. 267]

304. Some neonatal studies show that the chances of survival for a 27 week old fetus under ideal conditions (including adequate fetal weight and lung development), is now approaching ten percent (10%). One study conducted between 1978 and 1983 found that the survival rate of fetuses older than 26 weeks' gestation had improved, but that there was no improvement in infants with a gestational age of less than 26 weeks. Sell, *Outcome of Very, Very Low Birth Weight Infants,* 13 Clinics in Perinatology 451, 454 (1986). [Stipulation of Uncontested Facts para. 268]

305. Several studies find a 100% mortality rate for fetuses of less than 24 weeks' gestational age. Sell, *Outcome of Very, Very Low Birth Weight Infants,* 13 Clinics in Perinatology 451, 455 (1986); Koops, et al., *Neonatal Mortality Risk in Relation to Birth and Gestational Age: Update,* 101 Journal of Pediatrics 969, 971 (1982); Britton, et al., *Is Intensive Care Justified for Infants Weighing Less Than 801 Grams at Birth?,* 99 Journal of Pediatrics

937, 941 (1981). [Stipulation of Uncontested Facts para. 269]

306. Two studies have reported 23 week gestational age survivals. They are: Yue, et al., *Prognosis for Infants Born at 23 to 28 Weeks Gestation*, 293 British Medical Journal 1200, 1202 (1986); and Milligan, et al., *Perinatal Intensive Care: Where and How to Draw the Line*, 148 American Journal of Obstetrics and Gynecology 499, 500 (1984). [Stipulation of Uncontested Facts para. 270]

307. By 1975, a survey of North American neonatal intensive care units found that infants born at or after 24 weeks' gestation and weighing more than 600 g were occasionally surviving. Behrman, et al., "Report on Viability and Nonviability of the Fetus," in HEW, *Report and Recommendations Research on the Fetus,* Wash. D.C.1975, Appendix 12 1–12 116. [Stipulation of Uncontested Facts para. 271]

308. An article by Dr. Phillip G. Stubblefield states that current publications appear to document that viability can occasionally occur at 23 weeks' gestation. Stubblefield, "Some Medical Considerations" in *Late Abortion and Technological Advances in Fetal Viability,* 17 Family Planning Perspectives 161 (1985). [Stipulation of Uncontested Facts para. 272]

309. Dr. Stubblefield reports that the World Health Organization changed its recommendation for the collection of perinatal data in 1979, establishing 22 weeks as the demarcation line between spontaneous abortion and birth. [Stipulation of Uncontested Facts para. 273]

310. Dr. Stubblefield states that because of the variability in fetal size and in the shape of the fetal head, even the best prenatal measurements cannot exactly predict gestation age but can only define a certain range of probability. [Stipulation of Uncontested Facts para. 274]

311. The biparietal diameter of fetal head measurement predicts gestational age within a range of ± 11 days for 95% of the population. [Stipulation of Uncontested Facts para. 275; Testimony of Dr. Dratman]

312. At Magee Women's Hospital in Pittsburgh, where plaintiff Dr. Allen is a staff member, no fetus has ever survived at 23 weeks gestational age. The survival rate at 24 weeks is approximately 10 percent. [Stipulation of Uncontested Facts para. 277]

313. In the opinion of Drs. Allen and Dratman, prior to the 23rd to 24th week, the structural development of the fetal lungs has not progressed sufficiently so as to be capable of supporting life, even with the help of modern medical technology. [Stipulation of Uncontested Facts para. 278; Testimony of Dr. Dratman]

314. In order for a fetus to survive birth, it must be able to transfer *in utero* fluids out of the lungs, and air into the lungs. This exchange process requires a threshold level of maturity in the epithelial lining of the lung. The current medical literature with which Drs. Allen and Dratman are familiar states that the lung development necessary to sustain fetal viability does not occur until a gestational age of at least approximately 23 to 24 weeks. Danforth & Scott, *Obstetrics and Gynecology,* 320 (5th ed. 1986); Bhat, et al., *Resuscitation and Respiratory Management of Infants Weighing Less Than 1000 Grams,* 13 Clinics in Perinatology 285, 286 (1986). [Stipulation of Uncontested Facts para. 279]

315. Even among those 23 to 24 weeks gestational age feti that have achieved adequate lung development, fetal weight must also be sufficient for the possibility of survival. [Stipulation of Uncontested Facts para. 280]

316. In the experience of plaintiff Dr. Allen, no fetus weighing less than 500 grams has survived. Medical studies concur, finding that there is a 100% mortality rate among infants weighing less than 500 grams. Britton, et al., *Is Intensive Care Justified for Infants Weighing Less than 801 Grams at Birth?,* 99 Journal of Pediatrics 939 (1981); Pleasure, et al., *What is the Lower Limit of Viability?,* 138 American Journal of Diseases of Children 783, 784 (1984); Koops, et al., *Neonatal Mortality Risk in Relation to Birth Weight and*

*Gestational Age: Update,* 101 The Journal of Pediatrics 969, 970 table 1 (1982). [Stipulation of Uncontested Facts para. 281]

317. It is the opinion of Dr. Allen that, in those rare instances in which a 23 to 24 week gestation age fetus is viable and does survive, the quality of life is likely to be seriously compromised, requiring extraordinary life support measures and involving severe mental and physical handicaps, suffering and, often, short-term survival. [Stipulation of Uncontested Facts para. 282]

318. The medical evidence of record persuades me that the possibility of survival of a fetus at a gestational age of earlier than 23 weeks is, at best, very remote.

319. Section 3210(b), as amended, provides:

> *Degree of care.* Except in the case of a medical emergency, every person who performs or induces an abortion after he has determined an unborn child to be viable shall exercise that degree of professional skill, care and diligence which would reasonably be necessary in order to preserve the life and health of any unborn child intended to be born and not aborted, and the abortion technique employed shall be that which would provide the best opportunity for the unborn child to be delivered alive unless, in the good faith judgment of the physician, that method or technique would present a greater medical risk to the life or health of the pregnant woman than would another available method or technique. The physician shall report the basis for his judgment pursuant to section 3214(a) (relating to reporting). The potential psychological or emotional impact on the mother of the unborn child's survival shall not be deemed a medical risk to the mother. Any person who intentionally, knowingly or recklessly violates the provisions of this subsection commits a felony of the third degree.

320. In choosing the most appropriate method or technique for performing an abortion at this stage of pregnancy, the physician must consider a number of factors. The decision may involve consultation with a number of persons, including the obstetrician, pediatrician, anesthesiologist, the patient, and her family. [Testimony of Dr. Dratman]

321. It occasionally happens that women in their 24th to 26th week of pregnancy sustain ruptured membranes. To preclude the possibility of serious infection (a life-threatening condition), it is generally agreed that the proper treatment in such circumstances is to induce delivery, which is not considered an abortion but an obstetrical procedure, with the purpose of emptying the uterus to avoid severe infection. Still, in instances where the fetus is only borderline viable, the primary concern of the physician is to deliver the mother as safely as possible, and to induce labor and delivery without surgical incision so as to avoid the risk of further infection. [Stipulation of Uncontested Facts para. 283; Testimony of Dr. Dratman]

322. Plaintiffs interpret section 3210 to mean that, although a 24 week-old fetus does not have a neurological system sufficient to provide accurate cues of fetal distress, a physician would have to monitor such a fetus's heart rate during labor and perform a hysterotomy in instances of fetal distress, even where the fetus is only 24 weeks old, in order to attempt a live delivery and give the fetus the "best possible" chance of survival. [Stipulation of Uncontested Facts para. 283; Testimony of Dr. Dratman]

323. A hysterotomy entails cutting into the uterus and is a procedure that poses serious risks to the mother at this stage of the pregnancy. Until the third trimester, the lower uterine segment is extremely thick and difficult to cut through. Considerable bleeding, scar tissue (which may cause future pregnancy complications) and the risk of cutting into a blood vessel (causing massive bleeding) are attendant dangers. [Stipulation of Uncontested Facts para. 284; Testimony of Dr. Dratman]

324. Under Act 31, some physicians may feel compelled by the fear of civil or criminal sanctions to perform hysterotomies in instances where, in the doctor's best medical judgment, training and experi-

ence, it would be contrary to the best interests of the mother. [Testimony of Dr. Dratman]

325. Dr. Dratman testified that, as a physician threatened with criminal sanctions, she "cannot afford to guess" about where her responsibility to the mother comes in, and would feel compelled to place the life and health of the unborn child above that of the mother. [Testimony of Dr. Dratman]

326. Section 3203, as amended, defines "medical emergency" as:

That condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of major bodily function.

327. This definition applies to the following provisions of Act 31 containing medical emergency exceptions: section 3204 (medical consultation); section 3205 (informed consent); section 3206 (parental consent or judicial bypass); section 3210 (post-viability procedures); section 3211 (viability determination); and section 3215(f) (public official's issuance of an order for an abortion without the express voluntary consent of the woman). Penalties for violation of these provisions include, variously, suspension or revocation of the physician's license, or criminal conviction for third degree felony or third degree misdemeanor.

328. In emergency medicine, it is essential that doctors be flexible in their response to their patients. Every person is different and each emergency condition presents the physician with a dynamic situation in which judgments must be made quickly and, if necessary, quickly altered or adjusted. [Stipulation of Uncontested Facts para. 290]

329. The definition of medical emergency contained in Act 31 departs from the normal medical definition of an emergency [Verification of Dr. Keddie; Testimony of Dr. Dratman] and differs from that contained in Pennsylvania's Emergency Medical Services Act of 1985, 35 Pa.S.A. § 6923.[8]

330. An example of how the definition of medical emergency contained in Act 31 may depart from medical practice is contained in the following hypothetical. A 16 year-old woman is 18 weeks pregnant. She is swollen; her blood pressure is elevated; her urine contains a considerable amount of protein; her reflexes are very brisk. She is diagnosed as having a clinical syndrome known as preeclampsia (toxemia of pregnancy). The only treatment for this condition is to terminate the pregnancy. Under normal obstetrical practice, her condition would be considered to pose a medical emergency. However, while eclampsia could cause seizures which could, in turn, lead to a concussion or other serious medical conditions, there is no clear risk of "substantial and irreversible impairment of major bodily function." [Testimony of Dr. Dratman] Therefore, this case would not fall within the definition of medical emergency contained in section 3203.

331. The definition of medical emergency contained in section 3203 may require a physician to act in ways that do not best protect or restore the health of his patient.

332. The definition of medical emergency contained in section 3203 contains an exception for the good faith judgment of the physician. However, Dr. Dratman testified that because of the perceived lack of clarity in the Act and the risk of loss of license or criminal liability, she does not feel able to rely on the good faith exception in exercising her medical judgment. [Testimony of Dr. Dratman]

333. Dr. Thomas E. Allen, M.D., is aware of no other law that, in his opinion, infringes so heavily upon a physician's discretion to decide when he is faced with a medical emergency as do the provisions of Act 31. [Stipulation of Uncontested Facts para. 291]

8. That statute defines medical emergency as "a combination of circumstances resulting in a need for immediate medical intervention." 35 Pa.S.A. § 6923.

334. Dr. Dratman knows of no other medical procedure where the physician is required to report the basis for his or her medical judgment to the Commonwealth. [Testimony of Dr. Dratman]

## DISCUSSION

The standard for a preliminary injunction in this circuit is familiar. Only one prong of that standard is seriously disputed here: the probability that plaintiffs will eventually succeed on the merits of their claims.

The Supreme Court has frequently reaffirmed the basic principle that a woman has a fundamental right to choose whether or not to terminate her own pregnancy. *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 759, 106 S.Ct. 2169, 2178, 90 L.Ed.2d 779 (1986) (*Thornburgh*); *Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 420 n. 1, 103 S.Ct. 2481, 2487 n. 1, 76 L.Ed.2d 687 (1983). This right may be significantly limited only where the State demonstrates that its regulation is narrowly drawn to serve a compelling state interest. Where abortion regulations do not impose a legally significant burden, the State need only show a rational basis for the regulation. *American College of Obstetricians and Gynecologists v. Thornburgh*, 552 F.Supp. 791, 796 (E.D.Pa.1982) (*American College I*). The Commonwealth may not, under the guise of protecting maternal health or potential life, limit the woman's right to obtain an abortion or intimidate her into continuing her pregnancy. *Thornburgh*, 476 U.S. at 759, 106 S.Ct. at 2178. Provisions which wholly subordinate constitutional privacy interests and concerns with maternal health in an effort to deter a woman from exercising her right to choose abortion will not be tolerated. *Id.*

During the first trimester of pregnancy, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician. *Roe v. Wade*, 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973). Only regulations which do not significantly burden the woman's decision and are justified by important state objectives will be permitted. *See, e.g., Planned Parenthood Ass'n, Inc. v. Ashcroft*, 462 U.S. 476, 489–90, 103 S.Ct. 2517, 2523–2524, 76 L.Ed.2d 733 (1983); *Ragsdale v. Turnock*, 841 F.2d 1358, 1368 (7th Cir.1988). However, the State may limit the right of a minor woman to obtain an abortion in a manner which would not be permissible in the case of an adult. *Bellotti v. Baird*, 443 U.S. 622, 640–41, 99 S.Ct. 3035, 3047, 61 L.Ed.2d 797 (1979) (*Bellotti II*); *American College of Obstetricians and Gynecologists v. Thornburgh*, 737 F.2d 283, 296 (3d Cir.1984) (*American College II*), aff'd, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986).

At approximately the beginning of the second trimester of pregnancy, the State's interest in protecting the health of the mother becomes compelling and may justify regulations which significantly burden the woman's right to terminate her pregnancy. *Roe v. Wade*, 410 U.S. at 164, 93 S.Ct. at 732.

For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may regulate, and even proscribe, abortion, except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. *Roe v. Wade*, 410 U.S. at 164–65, 93 S.Ct. at 732. The point of viability is not to be determined by the legislature or by the courts. It is a determination to be made solely in the medical judgment of the physician, based on the particular set of facts before him. *Colautti v. Franklin*, 439 U.S. 379, 388–89, 99 S.Ct. 675, 682, 58 L.Ed.2d 596 (1979); *American College II*, 737 F.2d at 292. Even after the point of viability, the mother's health must be the paramount consideration. The woman may not be required to bear any increased risk to her life or health in order to save the fetus. *American College II*, 737 F.2d at 292, 300.

Where the plaintiffs have shown that a regulation imposes a significant burden on the woman's right to abortion, the State has the burden of proving that the regulation is narrowly tailored to the precise Commonwealth interest at stake. *Repro-*

*ductive Health Services v. Webster*, 662 F.Supp. 407 at 416, 420 (W.D.Mo.1987). The State must make a reasonable effort to limit the effect of its regulation to that portion of the trimester during which its health interest will be furthered. *Akron*, 462 U.S. at 434, 103 S.Ct. at 2494–2495. Thus, if a regulation departs from accepted medical practice during a "substantial portion" of the second trimester, it may not be upheld simply because it is reasonable for the remainder of the trimester. *Id.; Ragsdale*, 841 F.2d at 1368, n. 8. It follows that if a regulation does not distinguish between the first and second trimesters, and would be permissible only in the second trimester, it must be stricken. *Ragsdale*, 841 F.2d at 1369.

The State may not adopt abortion regulations which depart from accepted medical practices. *Akron*, 462 U.S. at 434, 103 S.Ct. at 2494–2495; *American College II*, 737 F.2d at 292.

With these principles in mind, I turn to the specific challenges raised by the plaintiffs in this action.

*Section 3206 (Parental consent and judicial bypass)*

■ To be constitutional, a parental consent provision must not unduly burden the minor's right to seek an abortion. *Bellotti II*, 443 U.S. at 640, 99 S.Ct. at 3046. The Commonwealth must draw any parental consent requirement as narrowly as possible to serve its recognized interest in encouraging parental involvement in the minor's decision. *Id.* at 641–42, 99 S.Ct. at 3047.

Except in case of a "medical emergency," section 3206 requires a physician to obtain the informed consent of a parent or guardian before performing an abortion on an unemancipated minor or an incompetent woman. Because section 3206 does not define "informed parental consent," we must look to the provisions of section 3205(a) to give meaning to that term.

In order for consent to be "informed" within the meaning of the Act, the physician must have orally informed the parent of the nature of the treatment, its risks, and the alternatives thereto. 18 Pa.C.S.

§ 3205(a). The Act requires that the parent certify in writing that he or she has received this information. *Id.*

Although the Act does not explicitly require the parent to make an in-person visit to the clinic, plaintiffs argue that such a requirement is implicit in the concept of informed consent. Further, they argue that an in-person visit will be necessary in order to verify that the person giving consent is, indeed, the minor's parent or legal guardian.

Any requirement that a parent make an in-person visit to the clinic would carry with it the risk of a delay of several days or possibly weeks in obtaining an abortion, even where the parent is willing to consent. It may create additional financial and emotional burdens for the minor and her family. The parent may be obliged to take time off from work, which may entail loss of wages and scheduling difficulties. The parent may incur child care or travel expenses. The parent may be reluctant to explain his or her absence from work, or may not wish to be seen entering an abortion clinic. Such a requirement would also increase the clinics' costs, which would eventually be passed on to their patients.

Because a delay of even a few days can significantly increase the risks and costs associated with abortion, particularly where the minor is near or into her second trimester before she seeks the abortion, the delays inherent in any requirement of an in-person parental consultation could effectively deprive some minors of the right to obtain an abortion. If there is a less burdensome means of achieving the Commonwealth's goal of parental involvement in the minor's decision, it must be applied.

■ It is apparent that the same principles which support the Commonwealth's interest in encouraging parental involvement in the abortion decision, *see Bellotti II*, 443 U.S. at 634, 99 S.Ct. at 3043, justify a requirement that the parent's consent be "informed," so as to enable the parent to determine whether an abortion is in the minor's best interest. However, this interest can be served without requiring the

parent to visit the clinic. Consultation by telephone is adequate to provide the parent with sufficient information upon which to base consent. *See Planned Parenthood Ass'n of Atlanta Area, Inc. v. Harris*, 670 F.Supp. 971, 987–88 (N.D.Ga.1987) (in context of parental notification, requirement that parent attend clinic is not narrowly drawn and unduly burdens the minor's rights).

■ The Act is easily susceptible of an interpretation which would allow telephone consultation. Section 3205(a) contains no requirement that this communication take place in-person. Section 3205(a) does require that the parent sign a written statement that the appropriate information has been received. However, this requirement can be satisfied without requiring an in-person visit to the clinic. Routinely, several days pass between the time the minor contacts the clinic and the performance of the abortion. The clinic can easily mail a consent form to the parent. The minor could then bring the signed statement with her to the facility on the day of her appointment. If time does not allow for the use of the mails, clinic personnel could ask the parent to prepare and sign an appropriate statement.

■ Similarly, although plaintiffs' concerns regarding the proper identification of the parent are reasonable,[9] clinics may adequately verify the parent's identification without requiring an in-person visit to the clinic. They may, for example, require the parent to sign a non-notarized verification stating that he or she is the minor's parent or legal guardian. Since the Act establishes that such a verification is sufficient to establish the truth of the information contained in the minor's petition for judicial authorization for abortion, *see* 18 Pa.C.S. § 3206(f)(2), I conclude that a non-notarized verification, obtained by the abortion provider in good faith, would be sufficient to relieve the clinics from any threat of civil or criminal liability.

■ I conclude that the requirement of informed parental consent does not require that the parent make an in-person visit to the clinic and does not cause any unnecessary additional delays in the minor's ability to obtain an abortion. The requirement of informed parental consent is narrowly drawn to serve the Commonwealth's interest in encouraging informed parental involvement in the minor's decision and does not unduly burden the minor's right to obtain an abortion.[10]

The provisions for a judicial bypass procedure are more troublesome. No parental consent requirement can pass constitutional muster unless the Commonwealth has included an alternative judicial procedure which provides an established and practical avenue whereby the minor may demonstrate that she is sufficiently mature to make the abortion decision herself or that, though immature, an abortion would be in her best interest. *Bellotti II*, 443 U.S. at 643–44, 99 S.Ct. at 3043; *Akron*, 462 U.S. at 439–440, 103 S.Ct. at 2497; *American College II*, 737 F.2d at 297.

The judicial bypass procedure must preserve the woman's anonymity in order to protect her from public scrutiny. *American College of Obstetricians v. Thornburgh*, 656 F.Supp. 879, 889 (E.D.Pa.1987) (*American College IV*). A woman will necessarily be deterred from exercising her right to an abortion if there exists even a possibility that her decision and identity will become known publicly. *Thornburgh*,

---

9. The Commonwealth argues that the identification procedures used by hospital emergency rooms in obtaining parental consent over the telephone can be used by the abortion clinics. However, I note that emergency room practices would be governed by a separate statute, 35 Pa.S.A. § 10104, which permits the physician to bypass parental consent whenever "an attempt to secure consent would result in delay of treatment which would increase the risk to the minor's life or health." The medical emergency exception applicable to parental consent for abortion is more narrowly drawn. Therefore, I am not able to conclude from this record that the procedures employed in emergency rooms would adequately protect abortion providers from criminal and civil liability.

10. I do not reach plaintiffs' argument that the exception to the parental consent requirement contained in section 3206(b) is not adequate to remedy the perceived defect in the requirement of informed consent.

476 U.S. at 766, 106 S.Ct. at 2182. The State may not rely solely on generally stated principles of availability, confidentiality, and form. *American College II,* 737 F.2d at 297. Rather, the judicial bypass procedure must contain detailed provisions assuring confidentiality and dispatch. *Id.*

Act 31 represents a thorough and good faith effort by the Commonwealth to remedy those provisions of section 3206 which were previously found to be deficient. The sole remaining issue is whether the provisions of section 3206(f) adequately protect the confidentiality of the judicial proceeding.

Under section 3206(f)(2), the minor's petition for judicial authorization for an abortion must contain the name and address of her parents or guardian, her initials, and her age. It would be an easy matter for any person obtaining a copy of such a petition to deduce the identity of the minor. Therefore, unless this information is carefully protected from public scrutiny, section 3206 cannot stand. *Planned Parenthood v. Harris,* 670 F.Supp. at 992 (where petition contains minor's name and social security number, lack of specific provision for confidential recordkeeping renders provision unconstitutional); *Akron Center for Reproductive Health v. Rosen,* 633 F.Supp. 1123, 1143–44 (N.D.Ohio 1986) (where complaint contains address where minor can be reached, failure to protect from public scrutiny renders provision unconstitutional).

Section 3206(f)(1) provides that "court proceedings under this section shall be confidential." Standing alone, this generally stated principle of confidentiality does not enable the statute to survive a constitutional challenge. However, the Act also provides that the court of common pleas

> shall make in writing specific factual findings and legal conclusions supporting its decisions and shall order a sealed record of the pleadings, submissions, transcripts, exhibits, orders, evidence

and any other written material to be maintained which shall include its own findings and conclusions.

18 Pa.C.S. § 3206(f)(1). The Commonwealth maintains that these two provisions can be read together to require that the record be sealed at the outset of the proceeding, thus enabling the judicial bypass proceeding to pass constitutional muster.

■ Where an ambiguous statute is reasonably susceptible of a reading which renders it constitutional, and such reading comports with the probable intent of the legislature, the statute must be construed in such a manner as to render it constitutional. *American College II,* 737 F.2d at 300. However, the courts have repeatedly emphasized the need for detailed provisions to guarantee the absolute confidentiality of the judicial bypass procedure. *Id.* at 297. Here, the statute merely requires that the court "shall order" that a sealed record be maintained; it appears that an order of the court is required in each case. Moreover, the obvious reading of the statute is that the court shall, first, make its findings and shall then order a sealed record. There is no assurance that the minor's petition will be sealed from the moment it is filed. I am, therefore, forced to conclude that the provisions of section 3206(f)(1) do not adequately protect the confidentiality of the proceedings.

I note, however, that this matter may be easily remedied. Section 3206(h) authorizes the Supreme Court of Pennsylvania to issue such rules as may further assure that the judicial bypass procedure is conducted in such a manner as will ensure confidentiality. Therefore, I will not invalidate section 3206, but will enjoin its operation until such time as the Pennsylvania Supreme Court promulgates rules which fill this gap, without prejudice to plaintiffs' right to attempt to demonstrate that such rules are, themselves, unconstitutional.[11]

---

11. This disposition renders mere dicta any comment this court might have regarding plaintiffs' argument that the courts of common pleas are not presently prepared to effectuate the provisions of section 3206. Although this theory formed the basis for my temporary restraining

order, the established rule that a court should avoid unnecessary constitutional pronouncements, *United States v. Clemons,* 843 F.2d 741, 750 (3d Cir.1988) carries particular strength in the present context. I will, therefore, refrain from further discussion of this claim. If, at

*Sections 3207(b) and 3214(f) (Public disclosure of reports)*

Recordkeeping and reporting requirements which are reasonably directed to the preservation of maternal health and which properly respect a patient's confidentiality and privacy are permissible. *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 80–81, 96 S.Ct. 2831, 2846, 49 L.Ed.2d 788 (1976).

Sections 3207(b) and 3214(f) require that every facility at which abortions are performed file certain reports. Plaintiffs do not challenge the requirement that they file reports under these subsections. They do, however, challenge the provision that reports filed by any facility which has received state appropriated funds during the 12-calendar-month period preceding the filing of the report [12] shall be subject to public inspection, regardless of the amount or type of funding.

The prior version of these sections required that all reports filed thereunder be available for public inspection and copying. Three years ago, I found that public disclosure of these reports would impose a legally significant burden on a woman's fundamental right to obtain an abortion. *American College of Obstetricians and Gynecologists v. Thornburgh,* 613 F.Supp. 656, 666 (E.D.Pa.1985) (*American College III*). The evidence of record in this action persuades me that the situation has not changed. Abortion facilities and physicians remain under intense pressure from anti-abortion groups. Pregnant women and staff members are forced to pass through anti-abortion protesters on their way into the clinics. While this harassment comes from members of the public, and not from the Commonwealth, any action of the Commonwealth which may increase the risk of such harassment requires careful scrutiny.[13]

I held in 1985 that this significant burden was not justified by the Commonwealth's interest in the protection of maternal health or potential life. *Id.* at 670. I also rejected the Commonwealth's argument that public disclosure was justified by the Commonwealth's interest in encouraging the exercise of the first amendment rights of those who oppose abortion. *Id.* at 670–71.

Having redrawn the statute to narrow the class of reports subject to public inspection, the Commonwealth now seeks to justify public disclosure on the ground that the public has a right to know how its tax dollars are spent. A regulation designed to inform the public about public expenditures does not further the Commonwealth's interest in protecting maternal health or potential life and, therefore, does not justify this legally significant burden on a woman's right to obtain an abortion. Just as the first amendment rights of the public could not justify public disclosure of all such reports, the public's right to know how tax dollars are spent cannot justify the Commonwealth's affirmative action which interferes with the fundamental right to decide whether or not to have an abortion. *Id.* at 670. *Compare Harris v. McRae,* 448 U.S. 297, 316, 100 S.Ct. 2671, 2687–2688, 65 L.Ed.2d 784 (1980) (although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those obstacles not of its own creation).

Moreover, I note that there are less obtrusive means through which the Commonwealth may satisfy the public's need to know how funds are spent. The Commonwealth could, for example, publish statisti-

---

such time as the supreme court takes action to remedy the gap in section 3206(f), the plaintiffs wish to reopen the record to renew their challenge to the preparedness of the courts of common pleas to effectuate the provisions of section 3206, they may do so.

**12.** Section 3214(f) refers to the 12–month period preceding the filing of the report. Section 3207(b) refers to the 12–month period preceding

the request to inspect. Since such a request could be made on the day the report is filed, the effect is the same.

**13.** The Commonwealth argues that the plaintiff facilities advertise in telephone directories and thereby subject themselves to such harassment. This argument was considered and rejected by this court in 1985. *American College III,* 613 F.Supp. at 669.

cal reports of public expenditures, showing aggregate funds paid to abortion facilities.

Therefore, I will enjoin the provisions of sections 3207(b) and 3214(f) which provide for public disclosure of reports.

*Sections 3214(a) and 3214(h) (Reporting requirements)*

Plaintiffs challenge various reporting requirements contained in sections 3214(a) and 3214(h). It is important to note at the outset that the information reported under sections 3214(a) and 3214(h) will, by statute, remain confidential. The reports are not public records within the meaning of Pennsylvania's Right–to–Know law. 18 Pa.C.S. § 3214(e)(2). Disclosure may be made to law enforcement officials only upon an order of a court of common pleas after application showing good cause. *Id.* The Department of Health's annual statistical report shall not lead to the disclosure of the identity of any physician, facility, or patient. 18 Pa.C.S. § 3214(e)(1).[14] There is no evidence of record to suggest that these statutory provisions regarding the confidentiality of these reports will not be strictly enforced.

■ Plaintiffs have also put forth evidence that the reporting requirements of section 3214 will impose a significant financial burden on the clinics, which will be passed on to their clients. However, I do not find that the additional cost to the clinic is so great that, in and of itself, it imposes an undue burden on the right to obtain an abortion.

I turn, then, to plaintiffs' specific challenges to these reporting requirements. Plaintiffs' first challenge is to the requirement of section 3214(a)(1) that the referring physician be identified in the individual abortion report. The evidence of record persuades me that notwithstanding the provisions for confidentiality many physicians, and particularly those physicians who have already ceased performing abortions because of harassment, will refuse to refer patients to abortion clinics if they know that their names will appear on these reports. I am further persuaded that the

resultant burden placed on the pregnant woman's ability to obtain an abortion is not justified by any health-related interest of the Commonwealth.

The Commonwealth asserts that this information is reasonably related to its health concerns because the referring physician may provide post-abortion services and may, therefore, be a source of follow-up information. However, to the extent that the referring physician may be aware of post-abortion complications, he is required to make an appropriate report under section 3214(h). To the extent that the Commonwealth may seek missing information, or further explanation of information contained on the facility's report, the ability and responsibility to provide that information rests with the abortion facility and performing physician, not the referring physician.

■ I conclude that the requirement that the referring physician be identified on the individual abortion report adds nothing to the pool of scientific knowledge, and does not serve the Commonwealth's legitimate health concerns. Therefore, I will enjoin the requirement that the referring physician be identified in this report.

■ The requirement that the performing physician be identified in the individual abortion report requires separate analysis. Although some physicians who have previously performed abortions will be deterred from doing so under this Act, this reporting requirement is reasonably related to the Commonwealth's interest in promoting maternal health. The performing physician would be the person best able to answer questions which may arise as to information contained on the report, or to provide missing information.

Plaintiffs contend that where individual circumstances require communication with the doctor, the Commonwealth could obtain his identity from hospital records. However, I must assume that the possibility that the physician would be identified in this way would operate as an equal deterrent to a physician who, notwithstanding

**14.** *See* discussion of § 3214(e), *infra.*

the provisions for confidentiality in the statute, is concerned about these reporting requirements. Therefore, I am not persuaded that the procedure suggested by the plaintiffs presents a less burdensome means of achieving the Commonwealth's goal.

I also note that, in its discussion of sections 3214(a)(7) and 3214(h), the Commonwealth has asserted that the complications reports are required to assist the Commonwealth in identifying providers or physicians experiencing an unusually high number of complications. Unless the report identifies the performing physician, the Commonwealth will be hampered in this attempt.

Plaintiffs suggest that the overall accuracy of the data will be adversely affected by the requirement that the performing physician be identified because some physicians or providers will simply fail to report. This will not, however, render the reports which are collected scientifically meaningless. To the extent that the Commonwealth's choice to require this report involves a balancing of conflicting state interests, it is for the legislature, and not this court, to strike the appropriate balance.

Because I conclude that the requirement that the performing physician be identified in the individual abortion report is reasonably related to the Commonwealth's interest in the promotion of maternal health, and is narrowly tailored to serve that interest, I must reject the plaintiffs' challenge to this reporting requirement.

Plaintiffs also challenge the requirement that the facility report any medical complications arising out of pregnancy or out of the abortion, 18 Pa.C.S. § 3214(a)(7), and that any treating physician file a report of complications arising out of an abortion, 18 Pa.C.S. § 3214(h). Plaintiffs argue that these reports will yield scientifically inaccurate data. They argue that the facilities may not be aware of post-abortion complications, that there are no uniform defini-

tions provided for complications, that some of the listed medical conditions are not generally considered complications of pregnancy, that there may be double-reporting where two physicians treat the same patient, and that some physicians who oppose abortion may over-report complications and skew the statistics.

The data gathered through these reports may not provide a perfect picture of the world at large. No doubt, there will be some erroneous or duplicative reporting. But I am not persuaded that the picture it does paint will be statistically meaningless. It is not for this court to criticize the Commonwealth's failure to implement a perfect system for collection of data. The only question before me is whether the data which will be collected through these reports will further the Commonwealth's legitimate health related interests. Because I conclude that this information is reasonably related to the Commonwealth's interest in the promotion of maternal health by adding to the sum of medical and public health knowledge through the compilation of relevant data, I reject plaintiffs' challenge to this reporting requirement.

■■■ The requirement that the facility report the length and weight of any fetus aborted after the 19th week of pregnancy, 18 Pa.C.S. § 3214(a)(9), is far more troubling. After viability, the Commonwealth may constitutionally choose to prohibit abortion entirely, except where it is necessary for the preservation of the life or health of the mother. But any presumption that a fetus is viable at 20 weeks is not justified by the medical evidence of record.[15] Therefore, the Commonwealth must show that this regulation is justified by its health-related interests.

I fail to see how a report of the measurement of the fetus serves to promote maternal health and life. Indeed, in many cases, dilation and evacuation is the safest and most appropriate method of abortion.[16] However, the requirement that the fetus be

15. See discussion of § 3211, infra.

16. In 1987, 73% of all abortions performed in Pennsylvania used suction curettage; an addi-

tional 26% used dilation and evacuation. Only 1% used other methods of abortion.

measured effectively precludes the use of the dilation and evacuation method of abortion which would not permit measurement of the evacuated fetus. The requirement that the length and weight of the fetus be reported could, therefore, compel the physician to use a less preferable method of abortion. This could adversely affect the mother's health and safety, and impermissibly interferes with the physician's exercise of his medical judgment.

Moreover, the evidence of record persuades me that because of the fear of criminal prosecution or loss of license, the requirement that the length and weight of the fetus be reported threatens to profoundly chill the physician's exercise of medical judgment in determining viability.

Because this reporting requirement fails to make the mother's health paramount at all times and threatens to chill the physician's exercise of his medical judgment, and is not justified by any legitimate medical or public health interest, I will enjoin its enforcement.

Finally, plaintiffs challenge the requirement that the physician report the basis for his medical judgment concerning viability (§ 3214(a)(8)), the existence of a medical emergency (§ 3214(a)(10)), and the choice of abortion technique (§ 3214(a)(11)).

■ The physician must be accorded broad discretion in exercising his medical judgment. The prospect that his exercise of medical judgment may be challenged at a later date, whether by the Commonwealth or by another physician, is likely to have a profound chilling effect on the physician's willingness to exercise his judgment in the mother's best interest. *Colautti*, 439 U.S. at 396, 99 S.Ct. at 686. Although I have found no case law expressly holding such a requirement unconstitutional, these provisions have been severely criticized, and have been considered as at least one factor which has rendered reporting requirements unconstitutional.

*See Thornburgh*, 476 U.S. at 766, 106 S.Ct. at 2182; *American College II*, 737 F.2d at 302. I now hold that a requirement that the physician justify his medical judgment by reporting the basis therefor in a written report impermissibly interferes with the woman's ability to effectuate her abortion decision. I will, therefore, enjoin the enforcement of these provisions.

*Section 3214(e) (Statistical report)*

Section 3214(e) directs the Pennsylvania Department of Health to prepare an annual statistical report for the General Assembly based upon data gathered from the individual abortion reports and complications reports. Plaintiffs challenge the constitutionality of section 3214(e) on the ground that, under its provisions, the identity of the abortion facility or the performing physician could be revealed in the annual statistical report.

■ However, the Legislature clearly intended to protect the identity of the physician and the facility, as well as that of the pregnant woman. The statute clearly provides that this report shall not lead to the disclosure of the identity of "any person ... about whom a report is filed." To the extent that the physician's name, or that of the facility, appears in the report, they are persons about whom the report is filed.[17] Thus, the clear language of the statute prohibits disclosure of their identity.

Therefore, I reject plaintiffs' challenge to section 3214(e).

*Pennsylvania Reporting Forms*

Pursuant to sections 3214(a) and 3214(h), the Pennsylvania Department of Health has prescribed its "Report of Induced Termination of Pregnancy" to be completed by all abortion facilities and "Abortions: Report of Complications" to be completed by all treating physicians. Plaintiffs, in a supplementary memorandum, have raised a number of challenges to these reports.[18]

---

**17.** Since sections 3214(a) and 3214(h) expressly provide that the patient shall not be identified in the individual reports, it would be impossible to identify the patient in the statistical report. I do not understand plaintiffs' supposition that the "person about whom a report is filed" can only refer to the patient.

**18.** Because these reports were not distributed until after the plaintiffs' motion for a prelimi-

The Report of Induced Termination re-quires facilities to report, *inter alia,* the patient's marital status, Hispanic origin, race, educational level, and date of last normal menses. Although the previous version of section 3214(a) required that such information be reported, Act 31 ex-pressly deleted these requirements from the Act.[19]

The Commonwealth argues that al-though Pennsylvania law does not require that this information be reported, the De-partment of Health may legally go beyond the requirements of the statute and re-quest this additional information.[20] The Department's stated purpose in requesting this information is to obtain socio-economic status information useful in examining fer-tility rates and for family planning.

In *Thornburgh,* the Supreme Court held the requirements of the predecessor of sec-tion 3214(a) unconstitutional because they went "well beyond the health related inter-ests" that may justify reporting require-ments in some cases. 476 U.S. at 766, 106 S.Ct. at 2182. Among the defects noted by the Court was the fact that section 3214(a) required information "as to the woman's personal history."

 Thereafter, the Pennsylvania Leg-islature, in an attempt to draw section 3214(a) more narrowly to fit its legitimate goal, deleted from section 3214(a) three ele-ments of information regarding the wom-an's personal history: her marital status, her race, and the date of her last menstrual period. Apparently, the Legislature under-stood the Supreme Court's opinion to have held that the Commonwealth could not con-stitutionally require this information. I agree with this reading of *Thornburgh.* In any event, it is clear from the legislative history that the Legislature determined that its stated interest in the promotion of maternal health and the protection of the viable unborn child was not furthered by a

requirement that this information be re-ported. Where the Commonwealth has it-self determined that this information does not serve its legitimate interests, any de-mand for such information in the abortion context must be deemed unconstitutional.

 Because, in the opinion of the Unit-ed States Supreme Court and the Pennsyl-vania Legislature, the requirement that this information regarding the woman's personal history (i.e., her marital status, Hispanic origin, race, educational level, and date of last normal menses) be reported is not reasonably related to the preservation of maternal health or the protection of the viable unborn child, I will enjoin the use of any Pennsylvania Report of Induced Termi-nation of Pregnancy which requires this information.

Plaintiffs also challenge section 15 of the Report of Induced Termination, relating to medical complications of pregnancy. There is no question that this section is unartfully drafted. Through an apparent oversight, no provision has been made for a report of "other" complications resulting from preg-nancy, as required by the statute. I have grave doubts whether information gath-ered through these reports, as drafted, can serve any useful scientific purpose. How-ever, because I am enjoining the use of these reports on other grounds, and be-cause there appears a reasonable probabili-ty that this situation is the result of an oversight which the Department may choose to correct, I will refrain from decid-ing the constitutional arguments raised by the plaintiffs at this time. If, at a later date, it becomes necessary to consider this question, the parties may file an appropri-ate motion.

During the hearing on May 9, there was testimony which suggested that the re-quirement that the physician sign the Re-port of Induced Termination had signifi-

---

nary injunction was filed, I have allowed them to expand their motion in this regard.

**19.** The demands for information regarding His-panic argument and educational level did not appear in the original Act.

**20.** Indeed, section 3214(a) requires that the forms "include" the information listed in the statute. Similarly, section 3214(h) provides that the form prescribed shall contain "such other information except the name of the patient as the department may from time to time require."

cantly increased the clinics' expense and was, therefore, unduly burdensome. I am not persuaded by the evidence of record that this requirement necessitates the procedures described at the hearing.[21] Therefore, I reject this challenge.

■ Plaintiffs challenge the Complications Report insofar as it seeks information regarding the type of previous abortion procedures, and the name and address of the facility which performed the abortion. Plaintiffs maintain that women are often unaware of this information, and argue that the form's failure to provide a space to so state renders it unconstitutional. The Commonwealth has responded that the Department of Health will accept as much information as is provided, and will accept a response to the effect that the information is unknown. I note, further, that the statute requires a report of "the following information, as received." 18 Pa.C.S. § 3214(h). I understand this to mean that the physician is required to report only such information as is provided by the patient. Therefore, I reject plaintiffs' challenge to this portion of the report.

■ Plaintiffs challenge section 5 of the Complications Report, requesting the "estimated menstrual weeks of gestation," arguing that this term has no medical meaning. The Commonwealth explains that this item seeks the estimated period of gestation in completed weeks from the date of the last normal menstrual period. I find that this item is sufficiently clear to compel me to reject plaintiffs' challenge.

■ Plaintiffs challenge items 7–9 of the Complications Report, requesting information regarding the nature of complications, the medical treatment given, and the nature and extent of any permanent condition caused by the complication. Plaintiffs maintain that no guidance or definitions

are supplied, and that the open-ended format will allow an undefined array of complications which will not add to the sum of medical and public health knowledge. For the reasons stated in my discussion of the requirement that complications be reported, *supra,* I reject this challenge.[22]

*Section 3211 (Viability determination)*

Under section 3211, the physician is required to make a determination of the viability of the fetus prior to performing any abortion upon a woman subsequent to the 19th week of pregnancy. The physician is further required to report the basis for any determination that the fetus is not viable, or, if viable, the basis for his determination that the abortion is necessary to preserve maternal life or health.

The predecessor to section 3211 would have required that this determination and report be made anytime a physician performed an abortion subsequent to the first trimester of pregnancy. The Third Circuit held that requirement unconstitutional because there was no evidence that there was a significant chance of viability throughout the second trimester, and because of other defects in the reporting requirements. *American College II,* 737 F.2d at 301.

Plaintiffs contend that section 3211 amounts to a legislative presumption that a fetus is likely to be viable after the 19th week of gestation, and that such a presumption usurps the role of the physician and is contrary to the medical evidence.

There is no important state interest furthered by requiring the physician to make an evaluation and report of viability before such time as there is a significant chance of viability. *American College II,* 737 F.2d at 301. Viability is reached when, in the judgment of the attending physician, there is a reasonable likelihood of survival outside

---

**21.** The testimony described the need to take the form from the clinic to the physician's private office for signature.

**22.** The Report of Induced Termination of Pregnancy and Report of Complications are also challenged insofar as they require information on past pregnancies, broken down by live births, spontaneous terminations, and induced

terminations. The Report of Complications further requires information regarding the type of abortion procedures. The provisions of sections 3214(a)(4) and 3214(h)(3) clearly authorize the Department to seek this information. Because plaintiffs have not challenged those provisions of the Act, I will not address this issue further.

the womb. *Colautti,* 439 U.S. at 388, 99 S.Ct. at 682.

■ The medical evidence of record establishes that survival at 23½ to 24 weeks gestational age, although rare, is reasonably possible. There is no evidence that there is a *significant* chance of survival before 23 weeks. Based on the current record, I must conclude that any requirement that the determination of viability be reported prior to the 23rd week of gestation suffers from the same defect which caused the Third Circuit to invalidate the predecessor to section 3211.

The Commonwealth has suggested that section 3211(a) could reasonbly be read to refer to 19 gestational weeks, which would be approximately equivalent to 21 menstrual weeks. I disagree. Gestational age is commonly measured in menstrual weeks. In the absence of a clear expression of legislative intent to the contrary, I read this statute as referring to menstrual weeks.

The fact that estimates of gestational age are subject to error of ± 11 days does not alter my conclusion. The determination of viability must be left to the medical judgment of the attending physician, considering the facts of the particular case. *Danforth,* 428 U.S. at 64, 96 S.Ct. at 2838–2839. Any exercise of judgment is, by definition, subject to error. But the possibility of error does not justify the Commonwealth's presumption that physicians will uniformly or routinely over-estimate gestational age by 2–3 weeks. Such a presumption clearly usurps the role of the physician, whose sole function it is to determine gestational age.

Moreover, any compulsion that the physician report the basis for his medical judgment that the fetus is not viable or that an abortion is necessary to preserve maternal life or health is inconsistent with the Supreme Court's directive that the physician be accorded broad discretion, and the threat of loss of license or criminal liability is likely to have a profound chilling effect on the willingness of physicians to perform abortions. *American College II,* 737 F.2d at 302. *See* discussion of reporting requirements, *supra.*

Finally, I note that of all abortions performed in Pennsylvania in 1987, 16 were performed subsequent to the 23rd week of gestation, while an additional 132 were performed subsequent to the 18th week. Thus, the requirement that the determination of viability be reported for all abortions performed subsequent to the 19th week, rather than the 23rd week, would appear to substantially and unnecessarily increase the burden of reporting.

Therefore, I will enjoin the enforcement of section 3211.

### Section 3210(b) (Choice of method)

Section 3210(b) provides that any person performing an abortion after the fetus has been determined to be viable must employ the abortion technique which provides the best opportunity for the unborn child to be delivered alive unless, in the good faith judgment of the physician, that method would pose a greater medical risk to the life or health of the mother.

■ I find that plaintiffs' vagueness challenge to this section is without merit. There is no evidence of record to persuade me that phrases such as "reasonably necessary," "delivered alive," and "greater risk" may not be easily understood by a physician of ordinary intelligence. The mere fact that the Act requires the physician to make judgment calls regarding viability or choice of method does not render it unconstitutional. *See Colautti,* 439 U.S. at 393–94, 99 S.Ct. at 685. The Act clearly establishes the physician's good faith exercise of his medical judgment as an absolute defense to any criminal liability; it is only the failure to exercise his good faith medical judgment which subjects the physician to criminal liability.[23]

Most importantly, section 3210(b), unlike its predecessor, makes the health of the mother paramount at all times. *See Amer-*

---

23. The provisions of this section which would subject the physician to criminal liability for failing to report the basis of his medical judg-

ment raise more troubling issues and are addressed, *supra.*

*ican College II*, 737 F.2d at 300. Plaintiffs argue that section 3210(b) would impose two independent, and sometimes conflicting requirements: first, that the physician exercise that degree of care required to preserve the life and health of the unborn child, and second, that the abortion technique employed be that which would provide the best opportunity for the unborn child to be aborted alive. Plaintiffs maintain that the qualifying clause, providing an exception for those cases in which that technique would present a greater medical risk to the life or health of the mother, qualifies only the second of these requirements. Thus, according to plaintiffs, there is no exception to the requirement that the physician exercise the degree of skill, care, and diligence necessary to preserve the life and health of the unborn child.

Dr. Dratman testified that this reading of section 3210(b) may require her to perform a caesarian section on a woman where that procedure would be dangerous to the woman, in order to safely deliver a fetus in distress. Were the statute to require the physician to make such a choice, it would violate the woman's rights by placing the life of the unborn fetus above the health of the mother.

Both the Supreme Court and the Third Circuit found that the predecessor to section 3210(b) was fatally defective because it provided an exception to the choice of method only where the risk to the mother was "significantly" greater. Neither court reached the plaintiffs' other vagueness challenges to section 3210(b). However, the Supreme Court apparently concluded that the qualifying clause applied only to the choice of method requirement. *See Thornburgh*, 476 U.S. at 768, 106 S.Ct. at 2182–2183.

However, section 3210(b) has since been amended to add an important comma between the two main clauses of this section. Apparently, the Legislature sought to correct the grammar which had enabled the Supreme Court to read this section as it did. A fair reading of the statute as it now stands is that the choice of method proscription should be considered only a spe-

cific application of the first clause, and that the qualifying clause applies to the degree of care as well as the choice of method provision.

The statute is easily susceptible of an interpretation which makes the health of the mother paramount at all times. Such an interpretation comports with the apparent intent of the Legislature and will, therefore, be applied by this court. Because section 3210(b) gives a physician of ordinary intelligence fair notice that his contemplated conduct is forbidden, and is not so indefinite as to encourage arbitrary and erratic arrests and convictions, I reject plaintiffs' vagueness challenge. *See Colautti*, 439 U.S. at 390–91, 99 S.Ct. at 683.

*Section 3203 (Definition of medical emergency)*

Plaintiffs maintain that the definition of medical emergency contained in section 3203 is unconstitutionally vague in that it contains terms which are indefinite and impossible to apply, and that section 3203 is unduly narrow and deviates from the generally accepted definition of medical emergency.

As already noted, the Commonwealth may not impose abortion regulations which depart from accepted medical practice. *Akron*, 462 U.S. at 434, 103 S.Ct. at 2494–2495 (1983); *American College II*, 737 F.2d at 292. The Commonwealth may not require the doctor to make a trade-off between the woman's health and fetal survival; the mother's health must, at all times, remain the paramount consideration. *American College II*, 737 F.2d at 300. Similarly, the Commonwealth's interest in encouraging informed consent and parental involvement in the abortion decision must give way in the face of any immediate and serious threat to the woman's health. Therefore, in order to pass constitutional muster, regulations which limit the woman's ability to obtain an immediate abortion must contain an adequate exception for medical emergencies.

The definition of medical emergency contained in the Act is unquestionably narrow-

er than that applied in other medical situations.[24] The doctor's exercise of his professional judgment is limited to situations in which any delay creates a serious risk of "substantial and irreversible impairment of [a] major bodily function" or death.

Many serious conditions arising out of pregnancy, *e.g.*, preeclampsia, may pose a serious threat to a woman's health without posing a risk of substantial and irreversible impairment of a major bodily function. I find that the narrow definition of medical emergency contained in section 3203 may compel a physician to act against his own best judgment and creates an unconstitutional trade off between the woman's health and the life or health of the fetus, or between the minor's health and the involvement of her parent in the abortion decision.

I will, therefore, enjoin the enforcement of all provisions containing this term.[25]

*Summary and Conclusions of Law*

Insofar as plaintiffs have shown a likelihood of success on the merits of their claims, I find that there will be irreparable harm to the rights of the pregnant women whom the plaintiff clinics represent if a preliminary injunction is not granted. I further find that this harm far outweighs any possible harm to the Commonwealth or to the public if an injunction is issued.

Plaintiffs have demonstrated a likelihood of success on the merits of their claim that the provisions of section 3206, as amended, fail to provide a sufficient guarantee that the petition of a minor who is forced to resort to the judicial bypass procedure will be protected from public scrutiny. I will, therefore, enjoin the operation or implementation of section 3206 until such time as the Pennsylvania Supreme Court

promulgates rules which will assure that the petition is sealed immediately upon filing. However, I find that plaintiffs have not established a likelihood of success on their challenge to the informed parental consent provisions of section 3206. I do not reach plaintiffs' challenge to section 3206 on the ground that the courts of common pleas are not prepared to effectuate its provisions.

Plaintiffs have demonstrated a likelihood of success on their challenge to the provisions of sections 3207(b) and 3214(f) which would allow public inspection of reports filed by any facility which has received state appropriate funds during the 12–calendar–month period preceding the filing of the report. I will therefore enjoin the defendants from disclosing or otherwise making available for public inspection and copying any report that has been filed or that may be filed pursuant to the provisions of sections 3207(b) and 3214(f).

Based upon the above discussion, I will enjoin the following reporting provisions of the amended Act: section 3214(a)(1) (insofar as it requires the identification of the referring physician); section 3214(a)(9) (requiring a report of the weight and length of the fetus); and sections 3214(a)(8), (10), and (11) (requiring a report of the bases for physician's medical judgments). I will also enjoin the use of the Pennsylvania "Report of Induced Terminations of Pregnancy" in its present form.

Plaintiffs have not shown a likelihood of success on the merits of their challenges to the requirement that the name of the performing physician be reported (section 3214(a)(1)) or the requirement that complications of pregnancy and of abortion be reported (sections 3214(a)(7) and 3214(h)).

---

**24.** Pennsylvania's Emergency Medical Services Act of 1985, 35 Pa.S.A. § 6923, defines medical emergency as "a combination of circumstances resulting in a need for immediate medical intervention."

The Commonwealth argues that this definition is not relevant in the abortion context because the purpose of section 6923 is "to prevent premature death and reduce suffering and disability that arise from critical illness and inju-

ry," while an abortion is a "supposedly minor procedure." The Commonwealth fails to recognize that the medical emergency in question is posed not by the abortion, but by the woman's pregnancy and complications thereto. The abortion is the cure, not the disease.

**25.** I do not reach plaintiffs' vagueness challenge to section 3203.

Nor have plaintiffs shown a likelihood of success on the merits of their challenge to the provisions of section 3214(e) (statistical reports).

Plaintiffs having shown a likelihood of success on the merits of their challenge to section 3211, which requires the physician to make a determination as to the viability of the fetus prior to performing any abortion upon a woman subsequent to the 19th week of pregnancy, I will enjoin the operation or implementation of that section.

Plaintiffs have not shown a likelihood of success on the merits of their challenge to section 3210(b) (choice of method).

Finally, I find that plaintiffs have shown a likelihood of success on the merits of their challenge to the definition of "medical emergency" contained in section 3203 of the Act. I will, therefore, enjoin the enforcement of all provisions of the Act which contain the term "medical emergency."

An appropriate order is attached.

## PRELIMINARY INJUNCTION

Upon application and hearing of plaintiffs' motion for a preliminary injunction, defendants' response, plaintiffs' supplemental memorandum, the memoranda and evidence submitted by the parties, and based upon the attached findings of fact, discussion, and conclusions of law, IT IS HEREBY ORDERED that:

1. Defendants are hereby enjoined from implementing or enforcing any and all provisions of section 3206 of the Pennsylvania Abortion Control Act of 1982, 18 Pa.C.S.A. § 3201–20, as amended by Act 31 of March 25, 1988 (1988 Pa.Legis.Serv. 173 (Purdon)), until such time as the Pennsylvania Supreme Court promulgates rules providing for the sealing of all court records immediately upon the filing of the minor's petition for judicial authorization.

2. Defendants are hereby enjoined from implementing or enforcing any and all provisions of section 3211 of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31.

3. Defendants are hereby enjoined from implementing or enforcing the provisions of section 3214(a)(1) insofar as it requires identification of the referring physician, and sections 3214(a)(8), 3214(a)(9), 3214(a)(10), and 3214(a)(11) of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31.

4. Defendants are hereby enjoined from distributing or utilizing the Pennsylvania "Report of Induced Termination of Pregnancy" as presently drafted for the collection of information pursuant to section 3214(a) of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31. Further, defendants are hereby enjoined from implementing or enforcing the provisions of section 3214(a) in its entirety until such time as an appropriate form has been drafted and distributed to abortion facilities.

5. Defendants are hereby enjoined from disclosing or otherwise making available for public inspection and copying any report that has been filed or that may be filed pursuant to the provisions of sections 3207(b) or 3214(f) of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31.

6. Defendants are hereby enjoined from implementing or enforcing all provisions of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31, that contain the term "medical emergency" as defined in section 3203 of the Act.

IT IS SO ORDERED.